No. 99-693

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 6

STATE OF MONTANA,

Plaintiff and Respondent,

v.

MICHAEL CARL HASER,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable Edward P. McLean, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Margaret L. Borg, Chief Public Defender, Leslie Ocks, Assistant Public Defender, Missoula, Montana

For Respondent:

Joseph P. Mazurek, Montana Attorney General, Ilka Becker, Assistant Montana Attorney General, Helena, Montana; Fred Van Valkenburg, Missoula County Attorney, Kirsten LaCroix, Deputy Missoula County Attorney, Missoula, Montana

Submitted on Briefs: December 21, 2000
Decided: January 30, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 The Appellant, Michael Carl Haser (Haser), appeals from an order and a judgment entered by the Fourth Judicial District Court, Missoula County. The order denied Haser's motion to dismiss due to the alleged violation of his constitutional right to a speedy trial. The judgment sentenced him to 40 years for one count of sexual intercourse without consent, and a concurrent sentence of six months for one count of sexual assault. Haser was found guilty of both counts following a jury trial. Haser argues that the District Court erred by denying his motion to dismiss for lack of a speedy trial, and that the evidence before the jury was insufficient to sustain a conviction for sexual intercourse without consent.

¶2 We affirm in part and reverse in part.

¶3 Haser raises the following two issues:

> 1. Did the District Court err in denying Haser's motion to dismiss for lack of speedy trial?

> 2. Was the evidence before the jury sufficient to sustain the conviction of sexual intercourse without consent?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 At issue on appeal is whether Haser was afforded a speedy trial, and whether the evidence was sufficient to sustain his conviction for sexual intercourse without consent involving two victims. Thus, the underlying factual and procedural background detailing the sexual assault conviction is not pertinent to our discussion and will be addressed accordingly.

¶5 Haser operated a photography studio, Picture Perfect Studios, in Missoula, Montana, at the time the alleged crimes of sexual intercourse without consent took place. Haser also published a free monthly magazine, Missoula Magazine. The two victims, both females, sought Haser's services as a professional photographer, specifically one who would take

professional-modeling photos. Both victims were interested in pursuing modeling careers, and one testified that she hoped that her photo would appear in Haser's magazine. One victim paid for her photo session, and the other had the option to buy photos at a later date, although Haser did not charge her for the session itself.

¶6 Each victim's account of Haser's conduct during the photo sessions is similar. Each woman testified that she was alone in the studio with Haser during the scheduled appointment. One victim testified that the session lasted six hours, and the other testified that her session lasted two hours. It is undisputed that the victims understood that they would pose before Haser wearing a variety of attire belonging to them or Haser, including swimsuits, and that the "modeling" involved striking poses similar to those found in fashion magazines.

¶7 What was not understood or disclosed prior to the photo sessions was Haser's insistence that he be allowed to rub lotion or apply makeup to their bodies, including their bare breasts. Haser similarly surprised the victims when he informed them that in order to avoid "panty lines" they would not be permitted to wear underwear. Haser apparently persuaded the victims that such conditions were necessary to improve the quality of the photos. Both women removed their underwear upon Haser's request, and allowed him to personally apply either lotion or makeup to their bare breasts.

¶8 Haser also repeatedly insisted that he had to adjust or re-position them in a particular pose, which also involved his touching them. It was during these sudden and frequent "adjustments" that one of his hands would slip under the women's clothing, rub between their legs, and up against their pubic region. The testimony reveals that his explanation at the time was that such interplay between his hand and the women's vaginal areas was strictly for the sake of attaining the optimal pose which would produce high quality photos. Haser does not deny now, on appeal, that his touching the two victims as described at trial constituted "penetration" pursuant to Montana law governing the offense of sexual intercourse without consent.

¶9 Neither victim abruptly ended the photo sessions due to Haser's conduct, however. Apparently, the victims voiced little or no objection to Haser's conduct during their respective sessions--due, apparently, to the suddenness of his actions and the resulting surprise or shock. Rather, at the time of the incidents, the victims believed or were led to believe that such treatment was incidental in the context of a professional model's photo session, although both testified that they thought at the time, as well as afterward, that

Haser's touchings were odd, disgusting, and made them uncomfortable. The two victims testified that Haser's conduct elicited embarrassment, surprise, shock, anger, and fear.

¶10 Haser's conduct with the two foregoing victims was not limited to them alone. Rather, the evidence indicates he routinely took similar liberties with other clientele. As a result of one victim coming forward, which led to an extensive police investigation, Haser was charged on November 12, 1997, with eleven counts of misdemeanor sexual assault in violation of § 45-5-502, MCA, or, in the alternative, eleven counts of misdemeanor assault in violation of § 45-5-201, MCA, and six counts of sexual intercourse without consent, in violation of § 45-5-503, MCA. On December 3, 1997, Haser entered not guilty pleas to all counts.

¶11 The State amended its information on December 22, 1997, increasing the number of counts of sexual intercourse without consent to eight. Haser entered a not guilty plea to the amended information on January 7, 1998.

¶12 On March 23, 1999, the State filed a second amended information, which consolidated the prior multiple counts into two. Under Count I, the State charged Haser with sexual intercourse without consent as a continuing course of conduct involving four victims, and under Count II, the State charged him with misdemeanor sexual assault as a continuing course of conduct involving 14 victims. Haser entered not guilty pleas to both counts.

¶13 Prior to trial, Haser filed a motion to dismiss for lack of a speedy trial. The District Court denied his motion at the conclusion of a March 25, 1999 hearing, and issued an opinion and order on April 1, 1999. Haser contended that the length of delay--502 days-- from the time the original charges were filed on November 12, 1997, until the scheduled trial date of March 29, 1999, denied his constitutional right to a speedy trial. The court concluded that the State was responsible for 276 days of the delay, and Haser was responsible for the remaining 226 days. The court concluded that the defendant had failed to demonstrate he had been prejudiced by the State's delay.

¶14 A jury trial commenced March 29, 1999. At the close of the State's case in chief, which included testimony from the victims, the daughter of one victim, police investigators, and an expert witness, Haser moved for a directed verdict on the ground that the evidence presented was insufficient to take the matter to the jury. The court denied the motion. Haser then called six witnesses, all women, to testify on his behalf. The witnesses testified that they knew Haser and in the past had either worked for or modeled for him--or

both. Their testimony was consistent in denying that Haser had ever engaged in inappropriate conduct with them during modeling sessions. None of the witnesses testified that they were present during the victims' photo sessions. None of the witnesses testified that they knew any of the victims.

¶15 On April 5, 1999, the jury returned a guilty verdict on the first count, sexual intercourse without consent, as applied to two of the four victims--meaning the jury found Haser not guilty of committing the offense with two of the four victims. The jury also returned a guilty verdict on the second count, sexual assault, committed on 11 different victims. Two of these 11 victims were the alleged victims of the sexual intercourse without consent charge that the jury found Haser not guilty of committing.

¶16 On June 2, 1999, the District Court sentenced Haser to 40 years with 20 suspended on the first count, and to six months on the second count. The judgment was entered on August 30, 1999. Haser appeals the denial of his motion to dismiss due to the violation of his constitutional right to a speedy trial, and the judgment that sentenced him to 40 years for the offense of sexual intercourse without consent.

## STANDARD OF REVIEW

¶17 We recognize that the violation of a defendant's right to a speedy trial is a question of constitutional law which requires that we review a district court's decision to determine if it is correct. *See State v. Taylor*, 1998 MT 121, ¶ 18, 289 Mont. 63, ¶ 18, 960 P.2d 773, ¶ 18 (citation omitted).

¶18 We review the sufficiency of evidence to support a conviction by viewing the evidence in a light most favorable to the prosecution and then determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See State v. Berger*, 1998 MT 170, ¶ 25, 290 Mont. 78, ¶ 25, 964 P.2d 725, ¶ 25 (citations and quotations omitted).

## DISCUSSION

### *Issue 1.*

*Did the District Court err in denying Haser's motion to dismiss for lack of speedy trial?*

¶19 Haser argues that the 276 day-delay attributable to the State pursuant to the District Court's order was incorrectly calculated, and that the State's evidence failed to disprove the presumption that he was prejudiced by the 502-day delay in this matter going to trial. Therefore, he contends that the District Court erred when it denied his motion to dismiss. We disagree.

¶20 Since 1972, we have reviewed claims that a speedy trial was denied in violation of the Sixth Amendment to the U.S. Constitution, and Article II, Section 24, of the Montana Constitution, based on the general guidelines established by the U.S. Supreme Court in *Barker v. Wingo* (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101. *See*, *e.g.*, *City of Billings v. Bruce*, 1998 MT 186, ¶ 19, 290 Mont. 148, ¶ 19, 965 P.2d 866, ¶ 19 (citations omitted).

¶21 The *Barker* test offers four criteria for a court's consideration: (1) the length of the delay; (2) the reason for the delay; (3) the assertion of the right to a speedy trial by the defendant; and (4) the prejudice to the defense. *See Bruce*, ¶ 19 (citing *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192). As this Court emphasized in *Bruce*, however, the four factors established by *Barker* "are necessarily general guidelines to be applied on a case-by-case basis to the unique circumstances of each case." *Bruce*, ¶ 20 (quoting from *Barker*, 407 U. S. at 533, 92 S.Ct. at 2193, that "these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process").

¶22 Primarily at issue here is the fourth element, that Haser suffered prejudice due to the delay. We stated in *Bruce* that prejudice sufficient for a dismissal can be established based on any one or more of the following factors: (1) pretrial incarceration, (2) anxiety and concern to the defendant, and (3) impairment of the defense. *Bruce*, ¶ 19 (citing *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193). Of these concerns, the U.S. Supreme Court has stated the following about their order of importance:

> Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.*Barker*, 407 U.S. at 532, 92 S.Ct. at 2193.

¶23 The District Court followed the three-part test in *Bruce* for determining prejudice, and

concluded that (1) Haser had been released on his own recognizance prior to trial; (2) Haser had not suffered any more "inordinate pretrial anxiety" than "any other defendant charged with a felony" and as time passed and the publicity died down the "tension and stress on the Defendant lessened;" and (3) Haser's defense was not "impaired or prejudiced" by the delay, rather, the "State's witnesses have suffered on parts of their recollection to the benefit of the Defendant."

¶24 Haser's first contention is that the court miscalculated the number of days of delay attributable to the State, and therefore incorrectly analyzed the "reason for the delay" prong of the four-part *Barker* test. We conclude that this argument is without merit.

¶25 As this Court has stated, once the delay attributable to the State exceeds 275 days, speedy trial analysis is triggered and prejudice is presumed. *See Bruce*, ¶ 56. Thus, because 276 days of the 502-day delay were allocated to the State, the burden shifted to the State to demonstrate that Haser had not been prejudiced by the delay. *See Bruce*, ¶ 56. If the State satisfied its burden of demonstrating that Haser had not been prejudiced by the delay, the burden would have shifted to him to show that he had been prejudiced. *See State v. Hardaway*, 1998 MT 224, ¶ 23, 290 Mont. 516, ¶ 23, 966 P.2d 125, ¶ 23. This is one of the primary functions of the "reason for delay" prong: to conclusively establish a burden shift for the determination of prejudice. Here, whether the delay attributable to the state was 276 days or 418 days (as Haser argues),[1] the State nevertheless bore the initial burden of showing that the delay did not cause Haser prejudice. Neither party contests this burden shift, and we conclude that the District Court did not error in assigning the burden to the State.

¶26 Further, Haser suggests the alleged 418 days of delay attributable to the State "may have been intentional rather than mere institutional delay." We agree that the constitutional question of a speedy trial is primarily designed to protect the accused from oppressive tactics of the prosecution, and that a showing that the delay was an intentional device to harass or gain tactical advantage over the accused rather than ordinary "institutional delay" is another primary function of the "reason for delay" prong of the *Barker* test. *See State v. Heffernan* (1991), 248 Mont. 67, 73, 809 P.2d 566, 569 (citing *Barker*, 407 U.S. at 529, 92 S.Ct. at 2191). Institutional delays, on the other hand, weigh less heavily against the State in the *Barker* balancing process than intentional delays resulting from oppressive tactics. *See Heffernan*, 248 Mont. at 73, 809 P.2d at 570 (citation omitted).

¶27 On appeal, Haser does not support his shadow of an innuendo with reference to any evidence or authority. We conclude that there was no showing by Haser, or any other evidence, that the State intentionally delayed his trial to harass him or to gain some tactical advantage over him. We agree with the State that the reason for its delay here was purely institutional in nature. *See Heffernan*, 248 Mont. at 73, 809 P.2d at 570.

¶28 Finally, this Court has never established a threshold number of days that conclusively establishes the denial of the right to speedy trial without the necessary finding of prejudice to the defendant. *See Bruce*, ¶ 56 (citing *Doggett v. United States* (1992), 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520). Although encouraging the District Court to entertain such a threshold, Haser does not suggest that this Court should do so now here on appeal, in light of his claim of error.

¶29 We conclude, therefore, that the District Court did not err in determining that, due to the length of the institutional delay attributable to the State, the State carried the initial burden of rebutting the presumption that Haser had been prejudiced by the delay. Therefore, we turn our attention to the issue of prejudice.

¶30 Of the three factors that a court considers under the "prejudice to the defense" prong of the *Barker* test, Haser and the State agree that the first, "pretrial incarceration," is not at issue.

¶31 As for the next factor, "anxiety and concern to the defendant," Haser contends that the State essentially offered no evidence to rebut the presumption of prejudice--other than what amounted to the State calling upon its own investigators to opine that they were not aware of any anxiety or concern by Haser. Haser argues that "the detectives had neither the opportunity, the qualifications, nor the inclination to determine whether the defendant endured anxiety and concern during the 500 days he awaited trial."

¶32 This Court has previously stated, however, that since it is nearly impossible for the State to prove that anxiety and concern do not exist, the State's burden to show a lack of anxiety becomes "considerably lighter in the absence of more than marginal evidence of anxiety." *State v. Williams-Rusch* (1996), 279 Mont. 437, 452, 928 P.2d 169, 178 (citations omitted).

¶33 Here, the State asserted through testimony and exhibits that to the best of its knowledge Haser had not undergone any treatment or otherwise suffered any extreme

distress due to pretrial anxiety or concern, and that he appeared to be maintaining employment and could continue to pursue business ventures related to the field of photography. We conclude that the District Court did not err in determining that, based on this evidence, the State met its burden in rebutting the presumption that Haser experienced prejudicial "anxiety and concern," during the 500-day delay before trial sufficient to warrant a dismissal.

¶34 In turn, we agree with the State that the anxieties expressed by Haser in rebuttal at his motion to dismiss hearing were clearly attributable to the fact that as a proprietor of a business that held its doors open to the general public, he stood charged of sexual crimes involving a substantial number of customers who sought his professional services. That these charges would directly and adversely impact his business as well as his reputation in the community speak far more to the nature of the crimes themselves than the delay in commencing the trial--whether that delay was 276, 391, or 418 days. We conclude that, at best, Haser presented marginal evidence of prejudicial anxiety and concern that can be attributed to the institutional delay in going to trial.

¶35 The third and final consideration under the element of prejudice, "impairment of the defense," which is the most important, focusses primarily on a defendant's ability to adequately prepare his case. Specifically, we look at whether the delay directly affected the defendant's ability to call witnesses on his own behalf--those who can be located and accurately recall events--and whether the delay directly diminished and impeded the defendant's own ability to present any other evidence, or develop a particular theory or line of defense. *See Bruce*, ¶ 71-73; *State v. Keating* (1977), 285 Mont. 463, 475-76, 949 P.2d 251, 259.

¶36 The State, in this instance, argues it sufficiently rebutted the presumption that the institutional delay in this matter impaired Haser's ability to prepare his defense. In sum, the State argued to the District Court that it had provided Haser all discoverable materials that could assist his defense and that none of his witnesses would provide exculpatory evidence. The State also argued that it had not impaired Haser's ability to assert an affirmative defense on account of any delay in this matter. On appeal, the State correctly states that Haser offered no evidence at the speedy trial hearing to restore the presumption of prejudice on this basis, and asserts that no such argument has been made here.

¶37 Haser does not argue that any of his witnesses were unavailable due to the delay. He does not dispute that all of his witnesses supplied character testimony only, or that not one

of his witnesses were present during any of the victims' photo sessions, or that not one of his witnesses knew or had had any contact with any of the victims. Thus, their memory of witnessed events would be marginal at best. As the District Court stated, witnesses for the State--i.e., the victims of the alleged offenses--were far more susceptible to memory loss.

¶38 Further, Haser has not contested here on appeal the State's assertion that it timely provided him with discoverable information concerning its witnesses and their statements, materials seized during the search of his business, and any statements he may have made. Likewise, Haser has not suggested that any such delay in this matter affected his ability to establish a defense, such as the affirmative defense of "alibi," which he alluded to in the omnibus hearing in early 1998, and in his February 27, 1998 motion to dismiss. In sum, Haser has not presented any argument, let alone evidence, that due to the State's delay in this matter he was not afforded an ample opportunity to review the State's case against him, refresh his own recollection of events, develop his theory of the case, or establish a credible affirmative defense.

¶39 Finally, we observe that the focus of Haser's prejudice argument centers on the "anxiety and concern" factor. Restated, Haser's argument on appeal regarding the factor of "impairment of defense" is that the State failed to meet its burden and, therefore, he is relieved of his burden to present evidence of prejudice in rebuttal. We disagree, and conclude that Haser's ability to prepare his defense was not prejudiced by the delay in this matter going to trial.

¶40 Accordingly, we affirm the order of the District Court denying Haser's motion to dismiss for lack of a speedy trial.

## Issue 2.

*Was the evidence before the jury sufficient to sustain the conviction of sexual intercourse without consent?*

¶41 Haser does not deny that any of the alleged conduct occurred, which includes various accounts of his hand, thumb, or fingers penetrating each victim's vaginal region. He does not deny that he deceived the women into submitting to conduct that obviously exceeded the reasonable boundaries of what constitutes a model's photo session with a professional photographer. In Haser's brief to this Court he blatantly admits that he used the same "it's all for the pictures" and "panty line" ploys on both victims to get them to remove their

underwear, that it was "certainly misleading" for him to put his hand between one of the victim's legs "up to her vaginal area under the guise of showing her how to pose," and that both victims fell for his deceptions "hook, line and sinker."

¶42 Instead, Haser focusses this Court's scrutiny of his conviction on the statutory element "without consent," contending that neither victim was "compelled to submit by force" or was "incapable of consent" as required under the governing statutes.[2]

¶43 The State counters by arguing that the victims in this instance were subject to what it contends was "constructive force," or that force may be implied due to the sudden and surprise nature of the "sexual attack," and, alternatively, both victims were physically incapable of consenting because Haser abused his position of power and trust over the young women, and lulled them into a state of vulnerability not unlike sleep or intoxication.

¶44 Under § 45-5-503, MCA, a person commits the offense of sexual intercourse without consent if he or she "knowingly has sexual intercourse without consent with another person." Under the general definitions provided under § 45-2-101, MCA, "sexual intercourse" includes "penetration of the vulva . . . of one person by a body member of another person . . ." and "any penetration, however slight, is sufficient." Accordingly, we conclude that there was sufficient evidence presented at trial for a rational trier of fact to find that Haser committed the essential element of "sexual intercourse" with the victims beyond a reasonable doubt.

¶45 Under the definitions provided by § 45-5-501(1), MCA, which are expressly applicable to the offense of sexual intercourse without consent under § 45-5-503, MCA, the term "without consent" means:

> (a) the victim is compelled to submit by force against the victim or another; or

> (b) the victim is incapable of consent because the victim is:

> (i) mentally defective or incapacitated; [or]

> (ii) physically helpless . . . [3]

Under § 45-5-501(2), MCA, the term "force" as used in subsection (1), sub-part (a), means:

(a) the infliction, attempted infliction, or threatened infliction of bodily injury or the commission of a forcible felony by the offender; or

(b) the threat of substantial retaliatory action that causes the victim to reasonably believe that the offender has the ability to execute the threat.

¶46 The instructions presented to the jury by the District Court followed the foregoing statutory definitions. The jury was also instructed that "Resistance by the victim is not required to show lack of consent" and that "Force, fear, or threat is sufficient alone to show lack of consent." This set of instructions is a verbatim recital of § 45-5-511(5), MCA, which provides provisions generally applicable to sexual crimes.

¶47 Under the general definitions of § 45-2-101, MCA, a person is "mentally incapacitated" if he or she is "rendered temporarily incapable of appreciating or controlling the person's own conduct as a result of the influence of an intoxicating substance." Obviously, this definition has no application to the factual circumstances *sub judice*. Under this same statute, a person is "physically helpless" when he or she is "unconscious or is otherwise physically unable to communicate unwillingness to act." This statutory definition was not presented to the jury in the court's instructions.

## A. The use of "force" under § 45-5-501(1)(a), MCA.

¶48 The State concedes that Haser did not threaten either victim. Thus, in order to satisfy the "compelled to submit by force" element of "without consent," under §§ 45-5-501 and 503, MCA, there must be evidence that Haser inflicted or attempted to inflict bodily injury, or committed a forcible felony. Under the general definitions of § 45-2-101, MCA, "bodily injury" is defined as "physical pain, illness, or an impairment of physical condition and includes mental illness or impairment." Under the same statute, a "forcible felony" means "a felony that involves the use or threat of physical force or violence against any individual." The instructions presented to the jury did not include these statutory definitions.

¶49 The testimony of the two victims, viewed in a light most favorable to the State, indicates that they experienced shock, embarrassment, surprise, anger, and perhaps even a trace of fear during the course of their respective photo sessions with Haser. The State has not argued, pursuant to state law, that any of these responses are a species of pain, illness,

or impairment inflicted by Haser in order to compel them to submit to his repeated acts of digital penetration.

¶50 Instead, the State argues that this Court should follow other jurisdictions that have construed the essential element of "force" to include "constructive force." *See State v. Brown* (N.C. 1992), 420 S.E.2d 147, 150 (stating that the "requisite force may be established either by actual, physical force or by constructive force in the form of fear, fright, or coercion") (citation omitted).

¶51 Contrary to the State's argument, however, Montana's statutory scheme accounts for "constructive force" pursuant to the amended version of § 45-5-501(2), MCA (amended in 1991), which provides that "force" includes threats of bodily injury or "substantial retaliatory action." Thus, under the current law in Montana, actual physical force is no longer necessary to satisfy the essential "submit by force" element of the offense of sexual intercourse without consent. Again, as conceded by the State, there was no evidence presented at trial that Haser, via his physical or verbal conduct, threatened either victim in any manner. Mere chicanery simply cannot be construed as a form of force under our governing statutes. Likewise, evidence that a victim is frozen in a state of shock or in a state of fear--but not as a result of a threat or as a result of an attempted or actual infliction of bodily injury or the commission of a forcible felony--is insufficient to establish that a defendant did in fact use "force" to compel a victim's submission to sexual intercourse. Thus, we conclude that Haser did not use "force" in compelling the victims to submit to sexual intercourse.

¶52 The State also argues that this Court should equate "surprise" with "force," and again turns our attention to case law from other jurisdictions. The State reasons that, due to Haser's surprise "attacks," the victims were not afforded the opportunity to consent, and therefore the use of force may be implied by the act of penetration itself. This argument formed the basis of the State's closing argument to the jury that Haser used force: "If you're surprised, then the force required to penetrate or the force required to touch is sufficient to satisfy the force requirement." *See State v. Adkins* (Mo. 1926), 292 S.W. 422, 426 (stating that "illicit sexual connection" with a woman may be accomplished "through surprise, when she is awake, but utterly unaware of his intention in that regard" and therefore "force merely incident to penetration should be deemed sufficient force within the meaning of the rape statute"). *See accord People v. Borak* (Ill.App.Ct. 1973), 301 N. E.2d 1, 5 (citing *Adkins* and concluding that "force" in the statutory sense is present when the victim is incapable of consenting to the sexual act involved because she has been given

no opportunity to consent and that force is "implied when the rape or deviate sexual acts proscribed by statute are accomplished under the pretext of medical treatment when the victim is surprised, and unaware of the intention involved"). The prosecution's comments to the jury, however, were not a correct statement of the law regarding the use of "force" under our sexual intercourse without consent statutes.

¶53 In contrast to Montana's clear statutory definition of "force," the Illinois court decision cited by the State recognized that its statutory requirement--that the proscribed sexual intercourse must be committed "by force and against the will of the other person"--could be present in certain circumstances "where no actual force is used," and where "no actual violence is either committed or threatened." *See Borak*, 301 N.E.2d at 4-5. *See also Brown*, 420 S.E.2d at 150 (stating that "'by force and against the will of the other person' as used in N.C.G.S. § 14-27.5(a)(1) has the same meaning as it did at common law when it was used to describe an element of rape" and that the element is present if the defendant "uses force sufficient to overcome any resistance the victim might make").

¶54 In sum, the case law cited by the State, however compelling, simply does not comport with Montana's clear legislative mandate that "force" must be related somehow to bodily injury, the attempted infliction of bodily injury, or an actual threat of some kind. We conclude that "surprise" penetration, alone, is insufficient to establish the essential element of "without consent" under § 45-5-501(1)(a), MCA, which requires that the victim was "compelled to submit by force."

¶55 Accordingly, we hold that there was insufficient evidence to support a conviction for sexual intercourse without consent in that a rational trier of fact could not have properly found that the essential element of "without consent," based on either victim being "compelled to submit by force" pursuant to § 45-5-501(1)(a), MCA, had been proven beyond a reasonable doubt.

### B. "Incapable of consent" under § 45-5-501(1)(b), MCA.

¶56 The State next contends that implicit in the definition of "incapable of consent," under § 45-5-501(1)(b), MCA, is the notion that the victim must have an opportunity to consent or to communicate a lack of consent, and suggests that Haser, as a professional photographer, managed to exploit his position of trust with the young hopeful models and thereby "lull" his victims into a state of mind analogous to intoxication or sleep, which satisfy, respectively, the statutory requirements of being mentally incapacitated or

physically helpless. *See State v. Graves* (1995), 272 Mont. 451, 457, 901 P.2d 549, 553 (victim "passed out" due to use of alcohol); *State v. Lundblade* (1986), 221 Mont. 185, 187, 717 P.2d 575, 577 (victim sound asleep and did not consent to sexual acts with defendant); *State v. Gould* (1995), 273 Mont. 207, 221, 902 P.2d 532, 541 (sufficient evidence for the jury to find beyond a reasonable doubt that victim was mentally incapacitated due to intoxication).

¶57 The "incapable of consent" alternative under the "without consent" definition of § 45-5-501, MCA, was not argued by the State in closing argument to the jury, but was included in the jury instructions and recited to the jury by the District Court. As noted, the statutory definition of "physically helpless," which is the only viable argument that the victims here were "incapable of consent" under § 45-5-501, MCA, was not presented to the jury.

¶58 Contrary to the State's argument, we conclude there is indeed a "logical difference" between Haser's sexual intercourse with the two victims and sexual intercourse with a sleeping or intoxicated victim. Namely, the victims here were awake and sober. Both were therefore conscious and physically capable of communicating an unwillingness to act, pursuant to §§ 45-5-501(1)(b)(ii) and 45-2-101, MCA, which defines "physically helpless."

¶59 Further, contrary to the State's encouragement, we are not at liberty to read into the already thoroughly defined statutory term "incapable of consent" such implicit notions as "opportunity to consent" or "awake and sober but unaware" to fit those circumstances where the victim has been "lulled" by another person. *See State v. Goodwin* (1991), 249 Mont. 1, 22-23, 813 P.2d 953, 966 (quoting 73 Am.Jur.2d Statutes § 295). Although we must construe the provisions of a penal statute "according to the import of their terms with a view to effect its object and to promote justice" (*see* § 45-1-102(2), MCA), the Legislature has provided specific definitions of the specific conditions that render a person "incapable of consent" under § 45-5-501(1)(b), MCA--statutory definitions which are noticeably absent from the State's argument here, and were not addressed by the State at trial in its development of its theory of the case or incorporated in its instructions to the jury.

¶60 We therefore conclude that there was insufficient evidence to support a conviction for sexual intercourse without consent. We hold that a rational trier of fact could not have properly found that the essential element "without consent" due to the victims being "incapable of consent" pursuant to § 45-5-501(1)(b), MCA, had been proven beyond a

reasonable doubt.

¶61 In sum, there was simply no evidence offered at Haser's trial that either victim was compelled to submit to his digital penetration by "force" or that either victim was "incapable of consent" because she was mentally incapacitated or physically helpless. Accordingly, without such evidence, a rational trier of fact could not have found that the essential element "without consent" had been proven by the State beyond a reasonable doubt. We therefore reverse that portion of the District Court's judgment that determined that Haser was guilty of the offense of sexual intercourse without consent.

¶62 Accordingly, the judgment of the District Court is affirmed in part, reversed in part, and remand for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

1. In its response brief to Haser's motion to dismiss, the State conceded that is was responsible for 391 days of delay.

2. Haser does not challenge his conviction for sexual assault involving a total of 11 women, all of whom he similarly deceived with his self-described "it's all for the camera" scheme. Like the crime of "sexual intercourse without consent" an element of sexual assault is "without consent." *See* § 45-5-502, MCA. The definition of "without consent," provided under § 45-5-501, MCA, however, is expressly applicable only to the offense of sexual intercourse without consent, § 45-5-503, MCA. The Legislature has not similarly defined the term as used in the sexual assault statute. Regardless, Haser has not argued that his sexual assault conviction should be reversed on the grounds argued under issue two.

3. The jury at Haser's trial was instructed on both subsection (a) and (b)(i)-(ii) of the "without consent" definition, with the exception of the "mentally defective" requirement.