JUSTICE NELSON,
specially concurring.
¶53 I concur in the Court’s conclusion that Billman was denied his constitutional right to a speedy trial. Moreover, except for the two points discussed in ¶¶ 58-71 below, I agree with the Court’s analysis in reaching this conclusion. I write separately, however, to clarify my position on certain facets of this case.
Balance of the Factors
¶54 I consider the speedy trial issue in this case to be closer than the Corut’s Opinion reflects. On one hand, while all of the 278-day delay was attributable to the State, there is no evidence that the prosecutor engaged in purposeful foot-dragging or bad-faith delay. Rather, almost all of the delay (roughly 90 percent of it) was due either to congestion in the District Court’s docket or to the legitimate unavailability of the *131 State’s witness (the arresting officer was unavailable to testify from late August through the end of September 2006 because he had been called away for military training), both of which are weighed less heavily against the State. See State v. Ariegwe, 2007 MT 204, ¶¶ 67-71, 338 Mont. 442, ¶¶ 67-71, 167 P.3d 815, ¶¶ 67-71. Furthermore, I cannot agree with the significance the District Court attributed to Billman’s testimony at the speedy trial hearing that he was feeling nervous and had begun taking anti-depressants and anti-anxiety pills during his incarceration. Billman produced no evidence whatsoever-not even an affidavit from the prescribing physician-tying his use of these medications to the delay (as opposed to the fact of being incarcerated). It is necessary, in this respect, to recall that a certain amount of anxiety and concern is inherent in being accused of a crime and that the speedy trial guarantee is designed to shorten-not eliminate-the disruption of life caused by arrest and the presence of unresolved criminal charges. Ariegwe, ¶¶ 97, 147-150. Consequently, the issue is not simply whether the accused feels nervous or has started taking medication to alleviate anxiety or depression while incarcerated. Rather, the key question is whether the delay in bringing the accused to trial unduly prolonged the disruption of his life or aggravated the anxiety and concern that are inherent in being accused of a crime. Ariegwe, ¶ 97. Accordingly, testimony by an accused that he is nervous, anxious, and taking medications is, by itself, and even if credible, inconclusive on the anxiety-and-concern issue.
¶55 On the other hand, I agree with the Court that Billman’s responses to-or, more specifically, his concerns and complaints about-the pretrial delay in this case weigh heavily in favor of the conclusion that he was denied his right to a speedy trial. Opinion, ¶¶ 33-35. Furthermore, it is well-established that both the prosecutor and the court have an affirmative constitutional obligation to try the accused in a timely manner and that this duty requires a good-faith, diligent effort to bring the accused to trial quickly. See Ariegwe, ¶ 65; State v. Blair, 2004 MT 356, ¶ 23, 324 Mont. 444, ¶ 23, 103 P.3d 538, ¶ 23; In re A.G., 2002 MT 111, ¶ 26, 309 Mont. 491, ¶ 26, 47 P.3d 831, ¶ 26. Thus, it is the prosecution’s duty, when it becomes aware that one of its witnesses is going to be unavailable to testify at trial, to notify the court and the accused of this fact promptly so that the trial can be reset for the earliest possible date. Here, however, the prosecutor’s motion to reset the trial due to the arresting officer’s absence for military training was filed on August 25, 2006, four days after the previous trial date of August 21 had passed. According to the *132 motion, the officer was “anticipated to return by October 1, 2006”; and the new October 30 trial setting presumably was the next available date on the District Court’s calendar. Yet, as Billman and the Court point out, a date closer to October 1 may have been available had the prosecutor moved for a continuance in a timelier manner. In light of the prosecutor’s failure to do so and the fact that the State bears the burden of explaining the pretrial delays, Ariegwe, ¶¶ 64-65, the resulting delay is properly accorded the weight associated with negligence or lack of diligence on the part of the State. Opinion, ¶ 27.
¶56 Lastly, Billman was incarcerated for 278 days awaiting trial on relatively simple charges (driving under the influence of alcohol, driving while suspended or revoked, and driving without proof of liability insurance) which did not require much time to prepare. Indeed, it appears that the State planned to call only one witness (the arresting officer) and that discovery was completed about two weeks after Billman’s arrest. Under these circumstances, the duration of Billman’s pretrial incarceration was oppressive. In this regard, I cannot agree with the State’s argument that Billman was not subjected to oppressive pretrial incarceration because, at the time of his arrest, he “was essentially unemployed and homeless” and, thus, “did not lose a job or a home as a result of being incarcerated.” Setting aside the fact that Billman testified to the contrary at the speedy trial hearing that he, in fact, was employed and resided at a motel at the time of his arrest, the suggestion that pretrial incarceration is not oppressive if the accused “was essentially unemployed and homeless” at the time of arrest is inappropriate. Granted, this Court has recognized that adverse impact on employment status due to incarceration or the presence of unresolved criminal charges is a pertinent consideration under Factor Four. See e.g. State v. Bailey, 201 Mont. 473, 480-81, 655 P.2d 494, 498-99 (1982); State v. Johnson, 2000 MT 180, ¶ 30, 300 Mont. 367, ¶ 30, 4 P.3d 654, ¶ 30; State v. Kipp, 1999 MT 197, ¶ 21, 295 Mont. 399, ¶ 21, 984 P.2d 733, ¶ 21. Thus, for example, if the accused was forced to give up a preexisting job while incarcerated, he or she might argue that the impact of this loss increased the oppressiveness of the incarceration or added to his or her anxiety and concern; and the same would be true if the accused lost his or her home while incarcerated due to an inability to make payments. However, we have never said that loss of preexisting employment or housing is a prerequisite to a determination of oppressive pretrial incarceration or aggravated anxiety and concern. Such an approach, which would disadvantage individuals who are without a stable job and home at the *133 time of arrest, would be incompatible with the constitutional right to fair and equal treatment under the law.
¶57 For the foregoing reasons, while I believe this case is close, I concur in the Court’s conclusion that the balance weighs in Billman’s favor.
Measuring the Length of the Delay
¶58 In measuring the length of the delay, the Court excludes the 33 days between the fourth trial setting (November 1,2006) and the fifth trial setting (December 4, 2006). That 33-day postponement was necessitated by Billman’s October 30 speedy trial motion. The Court explains that this period is not counted because the speedy trial timeframe ends on the date of the case’s disposition, and here the District Court granted Billman’s motion on November 1, which the Court states stopped the speedy trial clock. Opinion, ¶¶ 16-17, 29.
¶59 I agree with the Court that because Billman’s right to a speedy trial was violated as of Day 278, it is unnecessary to consider the additional 33 days leading up to the fifth trial setting. However, I disagree with the Court’s categorical statement that “the date that a district court grants a motion to dismiss based on speedy trial properly becomes the end date of the speedy trial interval.” Opinion, ¶ 17. It is entirely possible that under different circumstances, Billman’s right to a speedy trial would not have been violated as of Day 278, but would have been violated as of Day 311 (the fifth trial setting). In other words, under this scenario, those 33 days of delay would have tipped the scales in his favor. Yet, contrary to the Court’s intimation, he is not required to wait until Day 311 to file his speedy trial motion. Indeed, we have provided a strong incentive for defendants to file such motions at least 30 days in advance of trial. See Ariegwe, ¶ 116 (“[A]ny delay directly attributable to the filing of a speedy trial motion less than thirty days prior to the scheduled trial date should be charged to the accused. Conversely, any delay directly attributable to the filing of such a motion thirty or more days prior to the scheduled trial date should be charged to the State (as institutional delay).”). Accordingly, a defendant may argue in his motion that while his right to a speedy trial has not yet been violated, it will be by the time the current trial setting comes around.
¶60 A hypothetical may assist in making this point. On Day 200, as the result of the prosecutor’s motion to continue, the trial judge resets the trial for the earliest opening on the court’s calendar. That date is Day 300. The defendant, on Day 201, files a motion to dismiss, arguing *134 that the additional delay of 100 days violates his right to a speedy trial. On Day 210, the trial judge considers the motion, agrees with it, and dismisses the charges. The judge reasons that the speedy trial right is violated not by virtue of the existing 210-day delay, but by virtue of the unavoidable 300-day delay that will have occurred by the time the defendant actually is brought to trial. The State then appeals the decision to this Court. In this situation, we do not evaluate the speedy trial claim based on the delay of 210 days between arrest and the date of disposition. Rather, we consider the delay of 300 days between arrest and the last trial setting, as did the trial judge. For this reason, the Court’s statement in ¶ 17 to the effect that the length of the delay always terminates on the date the district court grants the speedy trial motion is incorrect.
¶61 The statement in ¶ 17 also would create an untenable possibility. Say that in the case at hand we had disagreed with the District Court that Billman’s right to a speedy trial was violated by Day 278 when the court considered his motion. Could we not then consider whether the right would have been violated on the last trial setting (Day 311)? Surely, we could. Indeed, it makes no sense to reverse the court’s decision and remand for a trial if Day 311 would have been constitutionally excessive delay.
¶62 The point here is that we should not be announcing an imprecise and overbroad rule that seemingly precludes consideration of pretrial delay all the way up to the final trial setting in cases where the district court has granted the speedy trial motion. In some of those cases, the period of delay between the date of disposition and the final trial setting may factor into the parties’ and the district court’s decision, in which case we too must consider that delay. In the case at hand, it is sufficient to hold that Billman’s right to a speedy trial was violated as of Day 278. Contrary to the Court’s analysis in ¶¶ 17 and 29, we are not precluded from considering the 33 days between the fourth and fifth trial settings; we just need not consider those days because the 278-day delay is sufficient.
Counting the Delay Occasioned by the State’s Appeal
¶63 Given the District Court’s and this Court’s determinations that Billman’s right to a speedy trial was violated as of Day 278, it also is unnecessary to consider the delay that has accumulated during the State’s appeal of the District Court’s ruling. Nevertheless, the Court points out that any such delay “bears no relevance to Billman’s speedy trial claim.” Opinion, ¶ 15. The Court explains that following the *135 District Court’s order granting Billman’s speedy trial motion, “no criminal charges were pending against Billman, nor was he subjected to actual restrictions on his liberty, and thus, the speedy trial guarantee no longer applied.” Opinion, ¶ 15 (citing United States v. MacDonald, 456 U.S. 1, 8, 102 S. Ct. 1497, 1502 (1982), and United States v. Loud Hawk, 474 U.S. 302, 310-11, 106 S. Ct. 648, 653-54 (1986)).
¶64 The Court’s reasoning is correct as far as federal law goes. See Loud Hawk, 474 U.S. at 310-12, 106 S. Ct. at 653-54. However, I question whether the Loud Hawk rule is appropriate for purposes of speedy trial analysis under the Montana Constitution. For that matter, I question whether we should be offering any view on this matter within the context of this case, given that it is totally unnecessary for us to consider what transpired after Day 278. In any event, because the Court cites the Loud Hawk rule, I shall discuss why I believe that categorical exclusion of the time which passes after the dismissal of charges on speedy trial grounds is ill-advised.
¶65 For one thing, a criminal case is not necessarily over just because a district court grants a speedy trial motion. In the case at hand, for instance, the State has continued “to align its full resources against [Billman] in judicial proceedings” by appealing the dismissal of the charges against him. Loud Hawk, 474 U.S. at 320, 106 S. Ct. at 659 (Marshall, Brennan, Blackmun, and Stevens, JJ., dissenting). Moreover, in so doing, the State has subjected the District Court’s decision to appellate review and, correspondingly, to the possibility of reversal, which would reinstate the charges. Consequently, until today, there has not been a final disposition of the charges against Billman. To the contrary, there has been a pending, docketed case captioned “State v. Billman” — a clear indication that Billman, throughout this period, has stood accused of a crime or crimes. One purpose of the speedy trial guarantee is “to minimize anxiety and concern accompanying public accusation.” United States v. Marion, 404 U.S. 307, 320, 92 S. Ct. 455, 463 (1971) (internal quotation marks omitted). Yet, a defendant may suffer severe anxiety, economic hardship, and damage to his reputation in the community while awaiting final disposition of the criminal accusations against him. SeeAriegwe, ¶ 96; State v. Haskins, 220 Mont. 199, 203, 714 P.2d 119, 121-22 (1986).
¶66 Aside from the continued pendency of the criminal case, there is the matter of impairment of the defense. Prejudice under Factor Four of the balancing test is assessed in the light of the interests of defendants which the right to a speedy trial was designed to protect. *136 Ariegwe, ¶ 86. One such interest is limiting the possibility that the defense will be impaired by dimming memories and loss of exculpatory evidence. Ariegwe, ¶¶ 87-88. The Supreme Court has characterized this interest as “the most serious” of the interests protected by the speedy trial right “because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.” Barker v. Wingo, 407 U.S. 514, 532, 92 S. Ct. 2182, 2193 (1972). The Supreme Court pointed out that “[i]f witnesses die or disappear during a delay, the prejudice is obvious” and that “[tjhere is also prejudice if defense witnesses are unable to recall accurately events of the distant past.” Barker, 407 U.S. at 532, 92 S. Ct. at 2193.
¶67 Likewise, this Court has recognized that “time may erode the accuracy of witness testimony and exculpatory evidence,” State v. Jefferson, 2003 MT 90, ¶ 36, 315 Mont. 146, ¶ 36, 69 P.3d 641, ¶ 36; that “[p]retrial delay prejudices an accused if defense witnesses are unable to accurately recall past events,” Opinion, ¶ 47; and that “[t]he loss of a ‘main witness’ as a result of delay attributable to the State is prejudicial to the defense,” State v. Kipp, 1999 MT 197, ¶ 23, 295 Mont. 399, ¶ 23, 984 P.2d 733, ¶ 23. Thus, we stated in Jefferson that impairment of the defense “often carries more weight than the other bases for concluding a defendant has been prejudiced by a pretrial delay.” Jefferson, ¶ 36. Similarly, the Court observes that “[Limiting the possibility that pretrial delay will impair the accused’s defense arguably is the most important interest that the speedy trial right protects because an accused’s inability to present an effective defense undermines the fairness of the system.” Opinion, ¶ 47; accord State v. Good, 2002 MT 59, ¶ 29, 309 Mont. 113, ¶ 29, 43 P.3d 948, ¶ 29; State v. Price, 2001 MT 212, ¶ 28, 306 Mont. 381, ¶ 28, 34 P.3d 112, ¶ 28.
¶68 It is not clear that impairment of the defense should carry the significance that Barker and many of our past decisions suggest.[1] *137 Indeed, the Supreme Court has given conflicting statements concerning the relative importance of this consideration. On one hand, as noted above, the Supreme Court has characterized the possibility that the defense will be impaired as “the most serious” of the interests that the speedy trial right was designed to protect. Barker, 407 U.S. at 532, 92 S. Ct. at 2193; accord Doggett v. United States, 505 U.S. 647, 654, 112 S. Ct. 2686, 2692 (1992). Yet, on the other hand, the Supreme Court has stated that the right to a speedy trial is “not primarily intended to prevent prejudice to the defense caused by passage of time,” MacDonald, 456 U.S. at 8, 102 S. Ct. at 1502; that “the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused’s defense,” Marion, 404 U.S. at 320, 92 S. Ct. at 463; and that “the Speedy Trial Clause’s core concern is impairment of liberty,” Loud Hawk, 474 U.S. at 312, 106 S. Ct. at 654 (emphasis added), as opposed to impairment of the defense. See also Doggett, 505 U.S. at 660-66, 112 S. Ct. at 2695-98 (Thomas, J., Rehnquist, C.J., & Scalia, J., dissenting).
¶69 But assuming that impairment of the defense is “the most serious” or “the most important” of the interests protected by the speedy trial right, it would defy logic to adopt a categorical rule excluding from our analysis the time which passes while the State appeals a district court’s grant of a speedy trial motion. Obviously, memories and evidence may degrade during this period. Indeed, degradation of memories and evidence does not magically stop on the date a speedy trial motion is granted. Moreover, if an exculpatory witness dies, if a crucial witness goes missing, or if exculpatory evidence is lost or destroyed during the course of the State’s appeal, the defense is impaired no less than if one or more of these events occurs before the speedy trial motion is granted or after this Court reverses the district court’s decision, reinstates the charges, and remands the case for trial.
¶70 In the case at hand, the District Court found (and this Court agrees) that Billman’s memory regarding the events surrounding his arrest faded during his 278-day incarceration and that this, in turn, impeded his ability to testify effectively and to prepare his defense adequately. Opinion, ¶ 48. Now, over 970 days have passed since Billman’s arrest on January 27,2006. It is implausible to suggest that his ability to present an effective defense is as strong now as it was 700 days ago. Thus, if impairment of the defense is to play such a prominent role in the Factor Four analysis, we cannot categorically exclude from the speedy trial equation the time which passes after the district court grants a speedy trial motion.
*138 ¶71 Indeed, had we decided that the District Court erred in granting Billman’s speedy trial motion, we could not then simply disregard the additional 700 days of delay occasioned by the State’s initial appeal, by this Court’s decision last November to remand this case to the District Court for the entry of findings of fact and conclusions of law based on Ariegwe, and by the State’s subsequent appeal following the District Court’s January 4,2008 order. Billman is in no way responsible for any of that delay, and we would render his constitutional right to a speedy trial utterly meaningless if we were to remand this case for a trial (which likely would not occur until well over 1,000 days had passed since his arrest) without first considering that delay. Accordingly, the Court should not so cavalierly dismiss the time that has passed since Day 278. Opinion, ¶ 15. If Billman’s right to a speedy trial was violated by 278 days of delay, can it logically be maintained that his right would not be violated by 1,000 days of delay?
The District Court’s Post-Ariegwe Order
¶72 Lastly, as just noted, this Court remanded this case to the District Court last November for the entry of findings of fact and conclusions of law based on Ariegwe. In Ariegwe, we set out our revised speedy trial test. See Ariegwe, ¶¶ 34-112. We consciously adopted and explained the new test in substantial detail so as to provide a logical and chronological structure to be used by counsel and the trial courts in resolving speedy trial claims. While the analytical model has been described as the “mother of all balancing tests,” Ariegwe, ¶ 184 (Rice, Morris, Leaphart & Warner, JJ., specially concurring), the Ariegwe framework, if followed, ensures that all of the relevant circumstances are considered and balanced. We demonstrated this in Ariegwe by applying the new test to Ariegwe’s speedy trial claim. See Ariegwe, ¶¶ 121-155.
¶73 Since Ariegwe was issued, appellate counsel in numerous cases have been diligent in following and analyzing the relevant factual circumstances pursuant to the new test. The Court’s Opinion in the case at hand likewise tracks the Ariegwe framework and provides a useful and well-reasoned application of the test to the facts of this case. Unfortunately, the same cannot be said of the District Court’s findings of fact and conclusions of law. It appears that the court simply took the outline provided in ¶ 113 of Ariegwe and plugged facts into it with little or no corresponding analysis. While that outline was provided as a summary or checklist of the various considerations that should be considered when applying the revised test, it was not meant as a *139 substitute for an actual detailed explanation of why the speedy trial motion should or should not be granted.
¶74 As noted, the Court’s Opinion lays out the analysis that the District Court should have provided under Ariegwe. But it is not this Court’s responsibility to provide the flesh to the trial court’s skeletal decision. That is not how the revised test was intended to operate; indeed, it turns the process on its head. In fact, the reason we remanded this case to the District Court following our decision in Ariegwe and the reason we have continued to follow this procedure in subsequent appeals involving speedy trial claims is to allow the trial courts to analyze the four factors and do the balancing in the first instance. In order to determine if a speedy trial motion should be granted and to enable this Court expeditiously to review that determination, it is necessary that the parties and the trial courts apply the test in the first instance comprehensively.
Conclusion
¶75 In conclusion, with the foregoing points in mind, I concur in the Court’s holding that Billman was denied his constitutional right to a speedy trial.

 See e.g. State v. Bowser, 2005 MT 279, ¶ 21, 329 Mont. 218, ¶ 21, 123 P.3d 230, ¶ 21 (stating that this consideration carries “more weight” than the other bases for concluding a defendant has been prejudiced by the pretrial delay); State v. Longhorn, 2002 MT 135, ¶ 39, 310 Mont. 172, ¶ 39, 49 P.3d 48, ¶ 39 (same); State v. Johnson, 2000 MT 180, ¶ 34, 300 Mont. 367, ¶ 34, 4 P.3d 654, ¶ 34 (same); City of Billings v. Peterson, 2004 MT 232, ¶ 35, 322 Mont. 444, ¶ 35, 97 P.3d 532, ¶ 35 (referring to this consideration as the “weightiest” interest); State v. LaGree, 2007 MT 65, ¶ 30, 336 Mont. 375, ¶ 30, 154 P.3d 615, ¶ 30 (stating that whether the delay caused any impairment to the defense is the “most important” consideration in determining prejudice); State v. Spang, 2007 MT 54, ¶¶ 12, 24, 336 Mont. 184, ¶¶ 12, 24, 153 P.3d 646, ¶¶ 12, 24 (same); State v. Blair, 2004 MT 356, ¶ 32, 324 Mont. 444, ¶ 32, 103 P.3d 538, ¶ 32 (same); State v. Stuart, 2001 MT 178, ¶ 20, 306 Mont. 189, ¶ 20, 31 P.3d 353, ¶ 20 (same); State v. Haser, 2001 MT 6, ¶ 35, 304 Mont. 63, ¶ 35, 20 P.3d 100, ¶ 35 (same).