No. 01-422

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 181

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

HAROLD LEE STEVENS,

        Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and For the County of Missoula,
Honorable Ed McLean, Judge Presiding

COUNSEL OF RECORD:

        For Appellant:

            Richard R. Buley, Tipp & Buley, Missoula, Montana

        For Respondent:

            Honorable Mike McGrath; Attorney General; Mark W. Mattioli,
Assistant Attorney General, Helena, Montana

            Fred Van Valkenburg, County Attorney; Suzy Boylan, Deputy
County Attorney, Missoula, Montana

                Submitted on Briefs:  November 29, 2001

                        Decided:  August 22, 2002

Filed:

           _____
                      Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1  Harold Lee Stevens appeals from the Fourth Judicial District Court's judgment of conviction of three counts of sexual intercourse without consent and three counts of sexual assault.  We affirm in part, reverse in part and remand for proceedings in accordance with this opinion.

¶2  The following issues are presented on appeal:

¶3  (1) Was the evidence before the jury sufficient to sustain the convictions of sexual intercourse without consent?

¶4  (2) Was the evidence before the jury sufficient to sustain the convictions of sexual assault?

¶5  (3) Did the District Court err in admitting testimony regarding whether the victims believed Harold Lee Stevens' actions constituted a crime and their subsequent emotional distress?

### FACTUAL AND PROCEDURAL BACKGROUND

¶6  Harold Lee Stevens (Stevens) operated a massage business in Missoula, Montana.  He advertised his business as HLS Massage, or "Healing Life's Stress."  Stevens performed massages on a massage table in a small room in which only his clients and he were present.  Stevens displayed his massage training diploma and business license in the room.

¶7  After escorting his female clients to the massage room, Stevens would routinely hand them a sheet and step outside while they undressed.  Some clients chose to fully undress while others would wear their undergarments.  All would cover themselves with a sheet.  Stevens would then knock on the door, ask the client if she

Comment [COMMENT1]: Tr 298

Comment [COMMENT2]: Tr 90-91

Comment [COMMENT3]: Tr 58-59

Comment [COMMENT4]: Tr 295

Comment [COMMENT5]: Tr 35

Comment [COMMENT6]: Tr 65

Comment [COMMENT7]: Tr 35

Comment [COMMENT8]: Tr 91

Comment [COMMENT9]: Tr 94-95

Comment [COMMENT10]: Tr 119

Comment [COMMENT11]: Tr 159

Comment [COMMENT12]: Tr 113

Comment [COMMENT13]: Tr 35

Comment [COMMENT14]: Tr 94-95

Comment [COMMENT15]: Tr 91

was ready and, if so, he would enter the room.  The lights in the massage room were low, and Stevens played soft music during the massage.  Some clients covered their eyes with a small eye pillow.  Stevens' clients testified at trial that they sought massages for relaxation, stress relief, or to treat their physical injuries or ailments.

¶8  Prior to beginning the massage, Stevens typically asked his clients if there were any problem areas of the body upon which he should focus.  Also, before or during the massage, Stevens sometimes requested that his clients tell him if he did anything they did not like.  However, very little other conversation or "small talk" occurred during the massage.  The massage usually commenced with the clients lying on their stomachs, and then, at Stevens' request, they would turn over onto their backs for the remainder of the massage.

¶9  On May 11, 1999, the State filed an Information charging Stevens with three counts of sexual intercourse without consent, three counts of misdemeanor sexual assault and one count of witness tampering.  Subsequently, the State filed an Amended Information charging five counts of sexual intercourse without consent, one count of attempted sexual intercourse without consent, five counts of misdemeanor sexual assault and one count of witness tampering. The case proceeded to trial on November 27, 2000.

¶10  At Stevens' trial, Darlene testified that she sought a full-body massage from Stevens. She testified that she specifically told Stevens that she believed this entailed everything except her

3

breasts and genitals. She admitted, however, that she did not remember making this statement to the police and a private investigator after the incident. After the first massage, Darlene felt comfortable with Stevens, and she made a second appointment for the next morning. The night before the second massage, Darlene took a Tylenol PM and was still "sleepy" when she arrived for the massage.

¶11 During the first part of this massage, while laying on her stomach, Darlene fell asleep. Although she woke up when Stevens asked her to turn over onto her back, she fell asleep again as Stevens continued. She awoke a second time when she felt the sensation of something inside her vagina. She opened her eyes and saw Stevens laying on top of her sucking on her breast. His fingers were inside of her vagina. Stevens had taken off his shirt and he had an erection. Darlene noticed that the sheet that had been covering her was set aside on a table. After a few seconds, when Darlene realized what was happening, she put her hand on Stevens' forehead and pushed him back. Upon her request, Stevens handed her a towel and left the room. After leaving, Darlene went to the emergency room and reported the incident to the police. The jury convicted Stevens of committing sexual intercourse without consent against Darlene.

¶12 Erin testified that she received several massages from Stevens. She had confidence in Stevens, and she referred others to him. During her last massage with Stevens, she stated that she stayed awake while lying on her stomach. Although she was awake

4

and aware of her surroundings, she was numb and almost asleep. After she turned over onto her back, she fell asleep, but awoke when Stevens moved to another section of the massage table. Erin was not concerned or uncomfortable when she first awoke. She stated that she was awake, but in a "total relaxed state."

¶13 Soon thereafter Stevens started massaging Erin's breasts and nipples. She was aware of, and remembered, Stevens' actions and that Stevens did not threaten her. Nevertheless, Stevens' behavior surprised her and her body and mind "froze." Stevens put his hand inside Erin's underwear and rubbed her clitoris, penetrating the outer lips of her vagina. Stevens proceeded to lick her nipple, thigh and vagina. All of the touching lasted approximately 10 minutes. Erin stated that Stevens' actions made her feel "horrible," but her mind and body were frozen and she was scared to do anything to stop him. The touching stopped after Stevens asked if what he was doing was okay, and Erin responded, "no." At that point, Stevens got off of the table, quickly finished the massage and then left the room. As she was leaving, Stevens asked Erin if she wanted this type of behavior to happen again. Erin responded that she did not, but that she would return "just because [she] wanted to get out of there." Erin contacted the police a few hours later. The jury concluded Stevens committed sexual intercourse without consent against Erin.

¶14 Jody testified that she received massages from Stevens for a sciatic nerve injury. She thought Stevens was very professional and thorough, and, over time, she increasingly trusted and felt

5

comfortable with Stevens. She testified that during these massages she would not fall completely asleep, but she would be "in a very far away place."

¶15 At her last massage with Stevens, he proceeded with the massage as usual. Jody testified that during the massage, she fell into a deeply relaxed "dream state" or "sleep rem stage." She stated that she wore an eye pillow. At one point, Stevens, as was customary, asked Jody to inform him if he did something she did not like. Jody understood this question to mean that she should tell Stevens if he caused pain to a muscle during the massage.

¶16 After Jody turned onto her back for the second portion of the massage, Stevens began to massage her breast area and her nipples. Jody stated that she was aware of the sensation of Stevens massaging her breasts, and she stopped breathing. Stevens then kissed her stomach, and she became "glued to the table." She "came out of the dream state" and Stevens was between her legs. Jody stated that Stevens proceeded to penetrate the outer lips of her vagina with his tongue. She also testified that, immediately after the incident, she was unsure if Stevens penetrated her vaginal canal.

¶17 Although she was afraid, Jody did not respond to Stevens' actions initially in order to avoid confrontation with him and a possible further attack. After a few moments, Jody said, "this isn't a good idea," and Stevens stopped, jumped off of the massage table and apologized. Stevens finished the massage and left the room. Jody reported the incident to the police the next day. The

6

Comment [COMMENT56]: Tr 235

Comment [COMMENT57]: Tr 241, 245, 259

Comment [COMMENT58]: Tr 243

Comment [COMMENT59]: Tr 238

Comment [COMMENT60]: Tr 238

Comment [COMMENT61]: Tr 239

Comment [COMMENT62]: Tr 260

Comment [COMMENT63]: Tr 261

Comment [COMMENT64]: Tr 240

Comment [COMMENT65]: Tr 243-44

Comment [COMMENT66]: Tr 262

Comment [COMMENT67]: Tr 264-65

Comment [COMMENT68]: Tr 259

Comment [COMMENT69]: Tr 242

Comment [COMMENT70]: Tr 244

jury convicted Stevens of sexual intercourse without consent against Jody.

¶18 Jennifer testified that she received massages from Stevens on two occasions. During the first massage, Stevens was very professional, and she felt comfortable with him and began to trust him. As a result, she sought Stevens' services a second time. The second massage began with her lying on her back, and Stevens massaged her breasts for about ten minutes. He then massaged her pubic and buttocks areas without touching her vagina. She stated she did not agree with Stevens' actions and felt angry and disgusted with herself for not leaving, but she did not voice her concerns because she "just wanted out and wanted to go home where [she] felt safe." Jennifer reported the incident. The jury convicted Stevens of sexual assault against Jennifer.

¶19 Elizabeth testified that she received massages from Stevens several times. She felt comfortable with Stevens, trusted him and entered a "relaxed state" while Stevens performed massages. During her last massage with Stevens, he asked Elizabeth to tell him if he did anything that made her uncomfortable. She thought the question was "completely out of the ordinary" and "alarming."

¶20 Shortly thereafter, Stevens, breathing heavily, began rubbing and pinching Elizabeth's nipples. She felt Stevens' erect penis against her upper arm. Elizabeth stated Stevens' actions took her by surprise. Stevens then peeled back the sheet covering Elizabeth and pressed his hand on her pubic area and put his fingers between her legs without penetrating her vulva. Elizabeth, believing

7

Stevens might rape her, lunged forward, picked up the sheet, covered herself and said, "Stop." Stevens stopped his actions and finished the neck and facial portion of the massage. Elizabeth testified that she knew she was alone in the building with Stevens and that no one would hear her if she cried out. She believed it would be unsafe to confront Stevens. Elizabeth promptly reported the incident. The jury convicted Stevens of sexually assaulting Elizabeth.

¶21 Tahra testified that she received two massages from Stevens. After the first massage, Tahra felt comfortable with Stevens, and she returned for her first full-body massage. After approximately one hour, Stevens told Tahra to turn over and he removed the sheet covering her body, leaving her completely exposed. Stevens massaged her breasts in what she described as a "groping session." She stated that she trusted him and was not sure if the full-body massage was proceeding normally. Although she did not feel physically threatened by Stevens, she testified she felt "like a deer in headlights," frozen, naked and vulnerable. Stevens stopped massaging Tahra's breast and, while massaging her legs, Tahra testified that his finger brushed her clitoris four or five times in rapid succession. At that point, Tahra said, "That's enough. I'm done." Stevens responded, "Okay," and abruptly left. The jury acquitted Stevens of sexual intercourse without consent, but the jury convicted him of sexual assault against Tahra.

¶22 Stevens was acquitted of the six other counts that the State charged. Stevens appeals the sufficiency of the evidence

Comment [COMMENT88]: Tr 164

Comment [COMMENT89]: Tr 165

Comment [COMMENT90]: Tr 172-73

Comment [COMMENT91]: Tr 175

Comment [COMMENT92]: Tr 176

Comment [COMMENT93]: Tr 176

Comment [COMMENT94]: Tr 177

Comment [COMMENT95]: Tr 184

Comment [COMMENT96]: Tr 185

supporting the convictions described above as well as the admission of portions of the victims' testimony.

## STANDARD OF REVIEW

¶23   The Court reviews the sufficiency of evidence to support a conviction by viewing the evidence in a light most favorable to the prosecution and then determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *State v. Haser*, 2001 MT 6, ¶ 18, 304 Mont. 63, ¶ 18, 20 P.3d 100, ¶ 18 (citing *State v. Berger*, 1998 MT 170, ¶ 25, 290 Mont. 78, ¶ 25, 964 P.2d 725, ¶ 25).

¶24   We review a district court's evidentiary rulings for an abuse of discretion.  *State v. Osborne*, 1999 MT 149, ¶ 14, 295 Mont. 54, ¶ 14, 982 P.2d 1045, ¶ 14.   The district court has broad discretion to determine whether evidence is relevant and admissible.   Absent a showing of an abuse of discretion, the trial court's determination will not be overturned.  *Osborne*, ¶ 14.

## DISCUSSION

¶25   (1) Was the evidence before the jury sufficient to sustain the convictions of sexual intercourse without consent?

¶26   For purposes of our review, we note that the incident involving Darlene occurred on July 3, 1996, and, thus, the 1995 versions of §§ 45-5-503, 45-5-501(2), and 45-2-101(56), MCA, apply.  As to the other sexual intercourse without consent incidents, the 1997 version of the statutes apply.

¶27   Under § 45-5-503, MCA, a person commits the offense of sexual intercourse without consent if he or she "knowingly has sexual

9

intercourse without consent with another person." Stevens claims the State failed to prove the "without consent" element beyond a reasonable doubt.

¶28  In relevant part, the term "without consent" is defined in § 45-5-501, MCA:

> (a) the victim is compelled to submit by force against himself or another; or
> (b) the victim is incapable of consent because he is:
> (i) mentally defective or incapacitated; [or]
> (ii) physically helpless . . .

¶29  In pertinent part, the term "force" is defined in § 45-5-501(2), MCA, as the infliction, attempted infliction, or threatened infliction of bodily injury or the commission of a forcible felony by the offender.

¶30  "Physically helpless" means that a person is unconscious or is otherwise physically unable to communicate unwillingness to act. Section 45-2-101(56), MCA.  The Commission Comments regarding the definition of "physically helpless" state:

> This definition is used in conjunction with the new section describing when a person is deemed to be incapable of consenting to a sexual act.  The term should be compared to other states of incapacity defined in the code such as "mentally defective" . . . and "mentally incapacitated" . . . . Under this definition a person who is paralytic or drugged to unconsciousness is deemed helpless.  The definition is taken directly from New York law as is much of the new Chapter 5 of Title 45 on sexual offenses.

¶31  Whether a victim is "physically helpless" at any given moment is largely a question of fact for the jury to decide.  *People v. Yankowitz* (1991), 564 N.Y.S.2d 488, 489 (citing *People v. Irving* (1989), 542 N.Y.S.2d 693, 694; *People v. Teicher* (N.Y. 1981), 422 N.E.2d 506, 511).

Comment [COMMENT97]: D brf 16

10

¶32   Stevens argues that there is no evidence that Stevens used any force or the threat of force against the victims.  Citing *Haser*, he contends that surprise and fear do not equate with force.

¶33   Stevens also argues that there was no evidence of "physically helpless" as set forth in § 45-2-101(56), MCA.  He states that all of the victims in this case were completely rational, sober, awake and able to communicate and respond.  Stevens relies upon three New York cases in which alleged victims of sexual intercourse without consent who could speak or verbally communicate in some way, such as the victims here, were not considered "physically helpless."  *People v. Clyburn* (1995), 623 N.Y.S.2d 448 (victim afflicted with Huntington's Chorea who could speak not "physically helpless"); *People v. Huurre* (1993), 603 N.Y.S.2d 179 (profoundly mentally retarded woman who could grunt and mumble not "physically helpless"); and *People v. Morales* (1988), 528 N.Y.S.2d 286 (woman unable to move her arms or legs due to muscular dystrophy not "physically helpless" since she could speak).

¶34   Stevens also insists that, according to the plain language of the "physically helpless" definition and the Commission Comments, "physically helpless" does not equate to surprise, dream states, dozing or any other condition less than someone who is unconscious or paralytic.  Stevens emphasizes that sleep is not part of the definition of "physically helpless." Citing *State v. Graves* (1995), 272 Mont. 451, 901 P.2d 549, Stevens argues that there is a difference between sleeping and being unconscious.

11

Comment [COMMENT98]: D brf 17

Comment [COMMENT99]: D brf 18

Comment [COMMENT100]: D brf 28

Comment [COMMENT101]: D brf 18-19

¶35 Alternatively, Stevens contends that even if the victims were "physically helpless," there is no evidence that he knew they were "unconscious or otherwise physically unable to communicate unwillingness to act."

¶36 In response, the State contends that the jury could have reasonably determined that it proved "without consent" beyond a reasonable doubt. It points out that, in addition to receiving the "paralytic" and "drugged" examples of "physically helpless," the jury in this case was also instructed, without objection, that these were non-exclusive examples of "physically helpless." The State maintains that sleep is a temporary state of unconsciousness, and, therefore, the Court should now hold that sleep can constitute "physically helpless" under §§ 45-2-101 and 45-5-501(1)(b)(ii), MCA.

¶37 The State goes on to argue that "physically helpless" is not limited to victims who are sleeping or completely lack the mental or physical capacity to communicate. It insists that the "physically helpless" definition is broad enough to include an individual who is, as a practical matter, physically unable or powerless to stop what is happening due to an induced physical condition and/or fear of bodily injury. In other words, the State claims a victim need not be literally unable to consent. The State emphasizes that it was within the jury's province to determine whether the victims were "physically helpless" and concludes that, in this case, the jury could have reasonably concluded that the sleepy and groggy condition Stevens induced was comparable to an

12

Comment [COMMENT102]: D brf 27

Comment [COMMENT103]: St 23

Comment [COMMENT104]: St 25

Comment [COMMENT105]: St 24

Comment [COMMENT106]: St 27

Comment [COMMENT107]: St 29

involuntary drugged condition since the victims' ability to appreciate what was happening was markedly diminished.

Comment [COMMENT108]: St 31-32

¶38 Up to this point, we have not directly addressed whether sleep

Comment [COMMENT109]: St 33

constitutes "physically helpless" for the purposes of §§ 45-2-101and 45-5-501(1)(b)(ii), MCA. Indirectly, however, we have concluded that sleeping victims could not consent to sexual intercourse. In *State v. Lundblade* (1986), 221 Mont. 185, 717 P.2d 575, the victim testified that she was sound asleep and awoke to find the defendant performing oral sex on her. *Lundblade*, 221 Mont. at 186-87, 717 P.2d at 576-77. The Defendant was convicted of sexual intercourse without consent. While we reversed his conviction after concluding that the State failed to prove the "penetration" element of the offense, we held that a rational juror could have properly found that the element of lack of consent was proven beyond a reasonable doubt. *Lundblade*, 221 Mont. at 187, 717 P.2d at 577.

¶39 In *Graves*, the victim "passed out" on her bed after a night of drinking, and she was awakened when she felt the defendant penetrating her vagina. *Graves*, 272 Mont. at 457, 901 P.2d at 553. The defendant was convicted of sexual intercourse without consent. Similar to Stevens, the defendant in *Graves* argued that the Court had not held that a sleeping victim was "physically helpless" and, in any event, the victim was not asleep during intercourse. *Graves*, 272 Mont. at 456, 901 P.2d at 553. We held that a rational juror could have found the essential elements of sexual intercourse

13

without consent beyond a reasonable doubt. *Graves*, 272 Mont. at 457-58, 901 P.2d at 553.

¶40 Most recently, in *Haser*, a case in which sexual intercourse without consent was alleged against a professional photographer, we distinguished between victims who were sleeping and victims who were awake for purposes of determining whether a person was "physically helpless":

> Contrary to the State's argument, we conclude there is indeed a "logical difference" between Haser's sexual intercourse with the two victims and sexual intercourse with a sleeping or intoxicated victim. Namely, the victims here were awake and sober. Both were therefore conscious and physically capable of communicating an unwillingness to act, pursuant to §§ 45-5-501(1)(b)(ii) and 45-2-101, MCA, which defines "physically helpless."

*Haser*, ¶ 58.

¶41 Montana derived its definition of "physically helpless" from the New York penal code. New York appellate courts construing the "physically helpless" definition like Montana's have held that "[i]t is well settled that the definition of physically helpless is broad enough to cover a sleeping victim." *People v. Sensourichanh*, 737 N.Y.S.2d 670, 671-72 (citations omitted). This is the case whether the sleep is drug induced or normally achieved. *People v. Copp* (1996), 648 N.Y.S.2d 492, 493 (it is axiomatic that sleep is the antithesis of awareness and renders one unable to make a conscious choice whether the sleep is induced by drugs or normal processes).

¶42 In the same vein, a Virginia court of appeals upheld a rape conviction after construing a "physically helpless" definition similar to Montana's. *Woodward v. Commonwealth* (Va. Ct. App.

14

1991), 402 S.E.2d 244. It concluded that even if the sleeping victim had some sensory perception during an attack, it did not mean that she was not unconscious or "physically helpless." *Woodward*, 402 S.E.2d at 245-46. The court reasoned that "common experience tells us that sleep is not an all or nothing condition." *Woodward*, 402 S.E.2d at 246.

¶43 Upon reviewing our prior case law as well that of New York and Virginia, we now hold that a sleeping victim of sexual intercourse without consent is "physically helpless" for purposes of §§ 45-2-101 and 45-5-501(1)(b)(ii), MCA. The statutory definition of "physically helpless" is broadly worded to encompass a person who is sleeping since such a person is temporarily unconscious or is otherwise physically unable to communicate unwillingness to act. In other words, a sleeping victim cannot consent to sexual intercourse. Whether a victim is indeed sleeping, and thus "physically helpless," is a fact question for the jury.

¶44 Here, Darlene testified that she took a Tylenol P.M. the night before her second massage with Stevens. She also testified that she fell asleep during the massage and awoke when she felt the sensation of something inside her vagina. Stevens admits that Darlene was asleep but argues that because she awoke when Stevens asked her to turn over onto her back, "Obviously, she was not in a very deep sleep."

¶45 Even if Darlene had some sensory perception during Stevens' acts, viewing the evidence in a light most favorable to the prosecution, we hold that any rational trier of fact could have

15

Comment [COMMENT110]: D 20

found that Darlene was asleep, and thereby "physically helpless," when Stevens, admittedly, had sexual intercourse with her. Credible evidence in the record supports the jury's determination that Stevens had sexual intercourse without consent with Darlene, and we affirm Stevens' conviction with respect to Darlene.

¶46  We cannot similarly conclude with respect to Jody and Erin. Jody testified that during her  massage, she fell into a deeply relaxed "dream state" or "sleep rem stage," but she was aware of the sensation of Stevens massaging her breasts.  At this point, she "stopped breathing."  When Stevens kissed her stomach, she stated that she became "glued to the table."  Erin testified that she was awake and aware of her surroundings, but she was numb and almost asleep.  Although at one point she did fall asleep, she awoke and was  in a "total relaxed state."  Erin testified that she was aware of, and remembered, Stevens' actions, and her body "froze" out of fear.

¶47  The State compares Jody's and Erin's circumstances to those in *Teicher*.  In *Teicher*, the victim was heavily sedated by her dentist and in an "extremely weakened condition" in which she had little control over her body.  *Teicher*, 422 N.E.2d at 510.  Here, Jody and Erin were not sedated and, although frightened, they had control over their bodies.  As such, the State's reliance on *Teicher* is misplaced.

¶48  The circumstances of this case resemble those in *Haser* where we rejected the State's argument that "lulling" victims into a state of mind analogous to intoxication or sleep was sufficient to

16

Comment [COMMENT111]: Tr 243

Comment [COMMENT112]: Tr 260

Comment [COMMENT113]: Tr 261

Comment [COMMENT114]: Tr 240

Comment [COMMENT115]: Tr 243-44

Comment [COMMENT116]: Tr 262

Comment [COMMENT117]: Tr 259

Comment [COMMENT118]: Tr 242

Comment [COMMENT119]: Tr 213

Comment [COMMENT120]: Tr 212

Comment [COMMENT121]: Tr 224

Comment [COMMENT122]: Tr 225

Comment [COMMENT123]: Tr 227

show "physically helpless." *See Haser*, ¶¶ 56, 59. Like the victims in *Haser*, Jody's and Erin's testimony indicates that they were awake and sober during Stevens' sexual acts. We are not at liberty to read into the already thoroughly defined statutory term "incapable of consent" such implicit notions as being "lulled" into a "dream state" or "total relaxed state." *See Haser*, ¶ 59.

¶49 Accordingly, we adhere to the distinction we drew in *Haser* between sexual intercourse with victims who are asleep versus victims who are awake, sober, and therefore conscious and otherwise physically capable of communicating unwillingness to act. The latter victims are not "physically helpless."

¶50 Here, considering the evidence in a light most favorable to the prosecution, we conclude that no rational trier of fact could have found that Jody and Erin were "physically helpless" under §§ 45-5-501(1)(b)(ii) and 45-2-101, MCA. While Jody and Erin were in a relaxed or dream state during their massages, there is simply no credible evidence in the record demonstrating that they were unconscious or otherwise physically unable to communicate unwillingness to act.

¶51 We also conclude that Jody and Erin were not compelled to submit to Stevens' actions by "force" as defined in § 45-5-501(2)(a), MCA. The State claims that the "force" element was met in this case because the women, who were too frozen, frightened and "physically helpless" to resist, experienced more than just a "trace of fear" as in *Haser*. Admitting there was no direct evidence of a threat of bodily injury or rape, the State contends

Comment [COMMENT124]: St 35-36

17

the threat was implicit in Stevens' sexually assaultive behavior.

¶52  While the State contends that Jody's and Erin's fear indicated that Stevens implicitly threatened them, there exists no evidence in the record that the victims' fear was a result of Stevens' infliction, attempted infliction or threatened infliction of bodily injury.  As such, there was no "force."  *Haser,* ¶ 51.

¶53  In sum, the State offered no evidence at Stevens' trial that Jody and Erin were incapable of consent due to "force" or being "physically helpless."  Accordingly, without such evidence, a rational trier of fact could not have found that the State proved the essential element "without consent" beyond a reasonable doubt.  We therefore reverse that portion of the District Court's judgment determining that Stevens was guilty of the offense of sexual intercourse without consent with respect to Jody and Erin.

¶54  However, on appeal, we may reduce the offense of which the appellant was convicted to a lesser included offense.  Section 46-20-703(3), MCA.  Whether sexual assault is a lesser included offense of sexual intercourse without consent has not been determined as a matter of law, and the issue is not before us now.  Yet, in resolving prior appeals, we have assumed for the purposes of individual decisions that sexual assault is a lesser included offense.  *State v. Black* (1995), 270 Mont. 329,  891 P.2d 1162; *State v. Sheppard* (1995), 270 Mont. 122, 890 P.2d 754; *State v. Ogle* (1992), 255 Mont. 246, 841 P.2d 1133; *State v. Sheppard*

18

(1992), 253 Mont. 118, 832 P.2d 370; *Lundblade*, 221 Mont. at 188-89, 717 P.2d at 578.

¶55 We recognize that the dissent in *Black* criticized this approach. It reasoned that if it was assumed that sexual assault was not a lesser included offense of sexual intercourse without consent, the defendant in *Black*, who was never charged with sexual assault and who was convicted in a bench trial, was not reasonably appraised of the charges against him in violation of his due process rights. *Black*, 270 Mont. at 339-41, 891 P.2d at 1168-69.

¶56 Here, unlike in *Black*, there is no question that Stevens was reasonably appraised of the sexual assault charges lodged against him. Stevens proposed a jury instruction, which the court gave without objection, stating that the crime of sexual intercourse "necessarily includes the lesser crime of sexual assault." It also stated that the jury could convict Stevens of sexual assault in the event that it was not satisfied that he was guilty of sexual intercourse without consent beyond a reasonable doubt. The verdict form was drafted in accordance with this instruction. Indeed, the jury reached a guilty verdict on the "lesser offense" of sexual assault with respect to Tahra.

¶57 Stevens clearly wanted the jury to have the option of convicting him of what he assumed was the lesser included offense of sexual assault. Accordingly, for the purposes of this decision, we will assume that sexual assault is a lesser included offense of sexual intercourse without consent. Based upon our discussion below, we hold that the State proved beyond a reasonable doubt

19

that, under § 45-5-502, MCA (1997), Stevens committed sexual assault against Jody and Erin. We therefore modify the District Court's judgment by reducing the offense of which Stevens was convicted to sexual assault pursuant to § 46-20-703(3), MCA.

¶58  (2) Was the evidence before the jury sufficient to sustain the convictions of sexual assault?

¶59  A person who knowingly subjects another person to any sexual contact without consent commits the offense of sexual assault. Section 45-5-502(1), MCA (1997). At the time of the incidents in this case, sexual contact was defined as "any touching of the sexual or other intimate parts of the person of another for the purpose of arousing or gratifying the sexual desire of either party." Section 45-2-101(65), MCA (1997). Unlike in the case of sexual intercourse without consent, the term "without consent" is undefined for purposes of sexual assault and, instead, has its ordinary meaning. *State v. Detonancour*, 2001 MT 213, ¶ 64, 306 Mont. 389, ¶ 64, 34 P.3d 487, ¶ 64.

¶60  Stevens contends that there was insufficient evidence to sustain the sexual assault convictions. Stevens does not contest that "sexual contact" was proven beyond a reasonable doubt. However, he argues that the State failed to prove Stevens "knowingly acted without consent." Essentially, Stevens claims that since the victims in this case failed to "communicate" their dissatisfaction when he initiated sexual contact during the massage, he could not have possibly known that they did not find

Comment [COMMENT125]: D 31

20

the contact "agreeable."  He also maintains no wrongdoing because when the victims asked him to stop, he did.

¶61  Incredibly, Stevens analogizes the facts of this case to a dating scenario in which he describes a "young man" who, progressively, touches a "young lady's" back, thigh, breast and pubic region without objection.  Stevens states that the young man should not later be charged with sexual assault because he should have known that the young lady did not want to be touched on the breast or pubic region.  He asks, "Are we willing to say the young man should go to jail because he was not a skilled enough mind reader?  There is no difference between the young man and Stevens.  The fact that Stevens is a masseuse makes no difference because one's profession is not a factor in the law."

Comment [COMMENT126]: D 34

Comment [COMMENT127]: D 34

¶62  The State insists that Stevens inappropriately and outlandishly characterizes obtaining a professional massage as a "date."  The State maintains that while a dating person may anticipate sexual touching, Stevens' massage clients, with good reason, did not.  Moreover, the State emphasizes that the victims' testimony that they "froze" out of fear indicated they did not consent to Stevens' sexual contact.

¶63   We agree.  Analogizing a professional massage by a licensed massage therapist with dating is ludicrous.  Elizabeth, Jennifer, Tahra, Jody and Erin were not Stevens' dates.  They were his massage clients.  Stevens' failure to recognize the difference between dating and providing a professional service to clients who trusted him is alarming.  Obviously, Stevens, as a professional

21

massage therapist, had no "implicit permission" to sexually touch his clients until they told him to stop. The professional relationship defined the limits that Stevens' clients could expect, and they did not expect to be sexually touched during their massage. It does not take a "skilled mind reader" to realize this.

¶64 Viewing the evidence in a light most favorable to the prosecution, we hold that any rational trier of fact could have found that Stevens knowingly subjected Jennifer, Elizabeth Tahra, Jody and Erin to sexual contact without consent. Credible evidence in the record supports this determination. Accordingly, the jury properly convicted Stevens of sexual assault against Jennifer, Elizabeth and Tahra. Also, pursuant to § 46-20-703(3), MCA, we conclude that Stevens committed sexual assault against Jody and Erin.

¶65 (3) Did the District Court err in admitting testimony regarding whether the victims believed Stevens' actions constituted a crime and their subsequent emotional distress?

¶66 At trial, the State asked two witnesses, Darlene and Janice, whether they believed Stevens' conduct was illegal. Darlene testified that at the time of the incident, she felt Stevens had been unprofessional only, but eventually she felt his behavior was criminal. Janice stated, "I don't know that I could say to you that I had sexual assault in my head, but I do think he did something that he did not have a right to do." Stevens objected on relevance grounds.

¶67 The State also questioned Darlene, over Stevens' relevance objections, about effects the incident has had on her personal relationships. She stated that her relationship with her husband was affected. The State asked Tahra whether she had been able to have a massage since the incident. Tahra responded that while she was "really leery" at first, she eventually got another massage.

¶68 Stevens contends that all of this testimony was irrelevant and designed to elicit passion and sympathy towards the victims and prejudice toward Stevens. He claims that whether the victims believed Stevens' actions constituted a crime, whether the victims' personal lives were affected and whether they were able to have subsequent massages did not tend to prove any fact of the case. He states that the irrelevant and highly prejudicial testimony biased the jury.

¶69 The State, on the other hand, argues the testimony was relevant because it tended to make the existence of a material fact, lack of consent, more probable than it would have been without the evidence. The State also points out that, at trial, Stevens only objected on relevance grounds and cannot on appeal bring a new claim that the testimony was more prejudicial than probative under Rule 403, M.R.Evid. In any event, the State insists that there is no reasonable likelihood that Stevens was prejudiced considering the strength of the evidence involving Darlene and considering Janice's and Tahra's equivocal answers to the State's questions and Stevens' acquittals with respect to Janice and Tahra.

23

Comment [COMMENT131]: Tr 44-45

Comment [COMMENT132]: Tr 181

Comment [COMMENT133]: D 35

¶70 Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rule 401, M.R.Evid. Except as otherwise provided, all relevant evidence is admissible. Rule 402, M.R.Evid.

¶71 Here, we conclude that the testimony at issue was relevant and admissible under Rules 401 and 402, M.R.Evid. Whether Darlene and Janice contemporaneously thought that Stevens' actions were criminal or wrong tended to make the existence of a material element, "without consent," more likely than without the evidence. Similarly, since sexual offenses commonly cause fear and distress, Darlene's and Tahra's subsequent fears tended to make the existence of lack of consent more probable than not.

¶72 Bearing in mind that the district court has broad discretion to determine whether evidence is relevant and admissible, we hold that the District Court in this case did not abuse its discretion in admitting the challenged testimony.

¶73 We affirm in part and reverse in part and remand for proceedings consistent with this opinion.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JIM REGNIER

24

Justice Jim Rice concurring in part and dissenting in part.

¶74    I concur with the Court in affirming the conviction of sexual intercourse without consent with respect to Darlene and the convictions of sexual assault with respect to Jennifer, Elizabeth and Tahra. I further concur with the Court's holding on the evidentiary question in Issue 3. I dissent from the Court's reversal of the convictions of sexual intercourse without consent with respect to Jody and Erin, and therefore would not reach the issue of the lesser included offense in regard to them.

¶75 The Court concludes that, under the statute, sexual intercourse with a sleeping victim is "without consent," but that sexual intercourse with a victim in a "sleep-like" state is not "without consent." Thus, the Court affirms the conviction with respect to Darlene, to whom the Court ascribes sleep but with "some sensory perception," but reverses the convictions with respect to Jody, who was in a deep "sleep rem stage," and Erin, who drifted in and out of sleep, and, as the Court notes, was "almost asleep" when violated. The Court thus ignores the admonition in *Woodward v. Commonwealth* (Va. Ct. App. 1991), 402 S.E.2d 244, 246, that "common experience tells us that sleep is not an all or nothing condition," which is painfully obvious here, and creates an artificial line at sleep's first moment that is neither realistic nor mandated by the statutes. Contrary to the Court's analysis, determining whether the victim was "physically helpless" is not a question of "sleep vs. awake"–terms which the statute does not mention–but rather, whether a rational jury could find that the victim was "otherwise

25

physically unable" to refuse intercourse.  I would find a rational jury could, and did, so conclude from the evidence presented here.

¶76   The Court's reliance on *State v. Haser*, 2001 MT 6, 304 Mont. 63, 20 P.3d 100, is misplaced.  The *Haser* Court properly rejected the State's argument that the victims there had been lulled into a state analogous to sleep or intoxication simply because the facts were to the contrary.  The *Haser* victims were fully alert and participated in a photo shoot wherein they repeatedly responded to the photographer-defendant's instructions to change their pose. The instructions to change positions were accompanied by Haser's inappropriate sexual touching.  In this case, there was no such "eyes wide open" participation by an alert victim.  To the contrary, the victims here were reclined comfortably in a room with soft music playing, were deeply relaxed and had fallen into the above-described sleep-like conditions.  I thus disagree with the Court's conclusion that the "circumstances of this case resemble those in *Haser*" and find that the State's argument in this matter to be substantially more compelling than it was in *Haser*.

¶77   The circumstances in this case more closely resemble those in *State v. Lundblade* (1986), 221 Mont. 185, 717 P.2d 575,  and *State v. Graves* (1995), 272 Mont. 451, 901 P.2d 549, where we upheld jury determinations that sexual intercourse with victims during their respective conditions of sleep and intoxication was "without consent" because of their physical helplessness.  Further, as the Court here acknowledges, and endorses by affirming the conviction with respect to Darlene, even a sleeping victim with some sensory

26

perception can be found to be "physically helpless." Consequently, the Court, instead of attempting to apply a bright-line rule to such variable states of consciousness, should recognize that whether a victim is "otherwise physically unable" to communicate her refusal is a matter of the victim's particular consciousness and is a factual question for the jury to determine.

¶78 Applying § 45-1-102(1), MCA, which, for purposes of penal statutes, sets aside the common law rule that statutes are to be strictly construed and requires penal provisions to be construed according to the fair import of their terms with a view to effect its object and to promote justice, I would reject the "how deep must sleep be?" quagmire adopted by the Court and allow juries to determine the victim's consciousness in accordance with the terms of the statute–whether the victim was "otherwise physically unable" to refuse–based upon the facts of each case. "The state of the victim's physical helplessness at any given moment is largely a question of fact . . . ." *People v. Teicher* (N.Y. 1981), 422 N.E.2d 506, 511. Viewing the evidence here in a light most favorable to the prosecution, I conclude that the jury rationally could have found the elements of the crime beyond a reasonable doubt, including physical helplessness, and would affirm the convictions of sexual intercourse without consent with respect to Jody and Erin.

/S/ JIM RICE

27