No. 04-036

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 249

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

BENJAMIN TIMOTHY SHIELDS,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and for the County of Missoula, Cause No. DC 2002-320
The Honorable Douglas G. Harkin, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Milton Datsopoulos, Datsopoulos, MacDonald & Lind, P.C., Missoula, Montana; William F. Hooks, Attorney at Law, Helena, Montana

    For Respondent:

        Honorable Mike McGrath, Montana Attorney General, Micheal S. Wellenstein, Assistant Attorney General, Helena, Montana; Fred Van Valkenburg, Missoula County Attorney, Suzy Boylan-Moore, Deputy County Attorney, Missoula, Montana

Submitted on Briefs:  March 30, 2005

Decided:  October 17, 2005

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Benjamin Timothy Shields (Shields) appeals from the judgment entered by the District Court of the Fourth Judicial District, Missoula County, upon a jury verdict finding him guilty of sexual intercourse without consent. We affirm. The sole issue on appeal is whether the evidence at trial was sufficient to support Shields' conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2    Shields and the victim dated periodically for approximately two years while they both attended Seeley Swan High School. They permanently ended the dating relationship approximately two months before Shields moved to South Carolina in December of 2001. Shields moved back to Seeley Lake in August of 2002.

¶3    On the evening of August 17, 2002, the victim attended a party with Shields and Arrow Hoehn (Hoehn). The victim consumed several alcoholic beverages at the party, and eventually became ill. Shields then drove Hoehn and the victim to her home. There, Hoehn went to sleep on the couch in the living room, and the victim went to sleep in her bedroom. Shields did not enter the victim's home at this time, but went back to the party. Later, Shields returned to the victim's home, entered her bedroom, and had sexual intercourse with her. Hoehn awoke when the victim emerged from her bedroom. Shields then left the residence, and Hoehn placed a 9-1-1 emergency call.

¶4    Deputy Heath Hanson, of the Missoula County Sheriff's Department, was dispatched after the 9-1-1 call. He arrived at the victim's home at about 5:00 a.m. on August 18, 2002, where he found her sobbing and sitting in the fetal position wrapped in a blanket. When he

2

first spoke with the victim, her answers were unintelligible. However, she later became more composed and explained what had happened.

¶5 On September 9, 2002, the State charged Shields with one count of burglary, a felony, in violation of § 45-6-204, MCA, and one count of sexual intercourse without consent, a felony, in violation § 45-5-503, MCA. A jury trial was held on March 13 and 14, 2003.

¶6 At trial, Shields testified that when he returned to the victim's home he knocked on the door, but received no answer. He testified that he then opened the door and Hoehn gave him permission to spend the night. Upon entry, Shields testified, he first fell asleep on a recliner, but later awoke and went into the victim's room. Shields testified that he then laid down in the victim's bed with her. At this point, Shields testified, they were both laying on their sides, with him behind her.

¶7 Shields testified that once in bed, he began to scratch her back, and "more led to more. And it became a sexual thing. And it led to intercourse." Further, Shields testified that the victim did not speak to him before the sexual intercourse, but that she helped him unbutton her pants and rolled over so as to facilitate intercourse. Shields testified that the sexual intercourse lasted for ten to fifteen minutes, after which he got out of bed, and the victim began to cry. At this point, Shields testified, he asked her what was wrong, but she refused to speak to him. Shields further testified that he became upset by the victim's refusal to speak, and therefore left her home. Finally, Shields admitted that he and the victim were not dating at the time of this incident, and that she had been giving him the "cold shoulder" throughout the evening.

3

¶8     The victim testified that she had engaged in sexual intercourse with Shields during the various periods of time when they were dating. However, she also testified that they had never engaged in sexual intercourse when they were not dating. The victim further testified that when she and Shields ended their dating relationship in 2001, she told him that it would never be renewed again.

¶9     The victim testified that she was uncomfortable around Shields on the night in question, and that she told Hoehn she would like him to spend the night at her home. After the party, the victim testified, she returned home feeling intoxicated. She testified that she had trouble feeding her dogs, as she felt like she "was going to fall down." Thereafter, the victim testified, she went to bed, fully clothed.

¶10    The victim testified that after she initially fell asleep, she awoke to the sensation of "weight" being placed on her body, but did not know what was happening at that point. She testified that she then blacked out and awoke again, at which point she realized that she was laying on her stomach, and that she was being pushed from behind, to the edge of her bed. Shortly thereafter, the victim testified, she realized that she was being raped. The victim also testified that she remembered someone pulling her pants at some point, but that she did not know exactly how they came to be removed. Finally, she testified that she did not know her assailant was Shields until she got out of bed and turned on a light.

¶11    Hoehn testified that he fell asleep shortly after arriving at the victim's house, and that he did not give Shields permission to enter the home. Additionally, Hoehn testified that he knew the victim was scared of Shields, and that he would not have let Shields in the home.

4

Hoehn also testified that he would not have let Shields spend the night because he knew the victim would not want Shields there.

¶12 Hoehn testified that he only became aware of Shields' presence in the home when he awoke after the victim "came running out of her bedroom." He testified that "[s]he was just hysterical. She was crying. And she couldn't talk pretty much; she was crying too hard." Thereafter, Hoehn testified, he saw Shields emerge from the bedroom and leave without saying a word.

¶13 The jury returned a verdict of not guilty on the charge of burglary, not guilty on the lesser included offense of criminal trespass to property, and guilty on the charge of sexual intercourse without consent. The District Court then sentenced Shields to a term of thirty years in the Montana State Prison, with twenty-nine years suspended. Shields now appeals, arguing that the evidence presented at trial was insufficient to support his conviction. Shields asks this Court to reverse his conviction and order the charge of sexual intercourse without consent to be dismissed.

## STANDARD OF REVIEW

¶14 The standard of review of the sufficiency of evidence underlying a conviction is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Stevens*, 2002 MT 181, ¶ 23, 311 Mont. 52, ¶ 23, 53 P.3d 356, ¶ 23.

## DISCUSSION

¶15    It is well settled that the due process clause, in both the federal and state constitutions, requires the State to prove beyond a reasonable doubt every element of a crime charged in a criminal prosecution. *State v. McCaslin*, 2004 MT 212, ¶ 24, 322 Mont. 350, ¶ 24, 96 P.3d 722, ¶ 24. Section 45-5-503(1), MCA, provides that "[a] person who knowingly has sexual intercourse without consent with another person commits the offense of sexual intercourse without consent." Section 45-5-501, MCA, provides:

> (1) As used in 45-5-503, the term "without consent" means:
> (a) the victim is compelled to submit by force against the victim or another; or
> (b) the victim is incapable of consent because the victim is:
> (i) mentally defective or incapacitated;
> (ii) physically helpless;
> (iii) overcome by deception, coercion, or surprise;
> . . . .
> (2) As used in subsection (1), the term "force" means:
> (a) the infliction, attempted infliction, or threatened infliction of bodily injury or the commission of a forcible felony by the offender; or
> (b) the threat of substantial retaliatory action that causes the victim to reasonably believe that the offender has the ability to execute the threat.

¶16    Section 45-2-101(57), MCA, provides that "physically helpless" means that "a person is unconscious or is otherwise physically unable to communicate unwillingness to act." Interpreting these statutes, this Court has stated that

> a sleeping victim of sexual intercourse without consent is "physically helpless" for purposes of §§ 45-2-101 and 45-5-501(1)(b)(ii), MCA. The statutory definition of "physically helpless" is broadly worded to encompass a person who is sleeping since such a person is temporarily unconscious or is otherwise physically unable to communicate unwillingness to act. In other words, a sleeping victim cannot consent to sexual intercourse. Whether a victim is indeed sleeping, and thus "physically helpless," is a fact question for the jury.

6

*Stevens*, ¶ 43.

¶17 Shields argues that the State failed to prove beyond a reasonable doubt that his sexual intercourse with the victim occurred without her consent. In support of this contention, Shields argues that the State offered insufficient evidence that the victim was incapable of consent by virtue of being "physically helpless." Shields acknowledges that a sleeping person cannot consent to sexual intercourse, as this Court held in *Stevens*, but asserts that the State presented insufficient evidence that the victim was asleep. Shields also asserts that the victim "was clearly an active participant" in the sexual intercourse, citing his own testimony that she "rolled over on her back" so as to facilitate intercourse.

¶18 As noted above, whether a victim was indeed sleeping, and therefore "physically helpless," is a question of fact for the jury to determine. *Stevens*, ¶ 43. Here, the victim testified that she fell asleep, and that she was not aware of what was happening until she awoke to the realization that she was being pushed to the edge of her bed. Further, the victim testified that she was not aware of who was in the room with her until she turned on the light. We have stated that the direct evidence of one witness who is entitled to full credit is sufficient proof of any fact. *State v. Gladue*, 1999 MT 1, ¶ 38, 293 Mont. 1, ¶ 38, 972 P.2d 827, ¶ 38. Consequently, the victim's testimony was sufficient to establish that she was indeed asleep during the sexual intercourse, and therefore "physically helpless." Shields' testimony, however, indicated that the victim was not asleep. He testified that she helped him unbutton her pants and rolled over to facilitate intercourse. Hence, the jury was faced

with conflicting testimony, the resolution of which required an assessment of the credibility of the witnesses.

¶19 The mere existence of conflicting testimony does not render the State's evidence insufficient to support a guilty verdict. *Gladue*, ¶ 39. Determining the credibility of witnesses and the weight to be given to their testimony is exclusively the province of the trier of fact. *State v. Bailey*, 2003 MT 150, ¶ 13, 316 Mont. 211, ¶ 13, 70 P.3d 1231, ¶ 13. In the event of conflicting evidence, it is within the province of the trier of fact to determine which will prevail. *Bailey*, ¶ 13. Thus, the fact that the victim's testimony was inconsistent with Shields' testimony does not establish that the State's evidence was insufficient to support the verdict.

¶20 In cases where we consider the sufficiency of the evidence, we will not substitute our judgment for that of the jury, which is able to view firsthand the evidence presented, observe the demeanor of the witnesses, and weigh the credibility of each party. *State v. Azure*, 2002 MT 22, ¶ 48, 308 Mont. 201, ¶ 48, 41 P.3d 899, ¶ 48. It is only in those rare cases where the testimony of a witness is so inherently improbable or is so nullified by material self-contradiction that no fair-minded person could believe it, that we may say no firm foundation exists for the verdict based on it. *State v. Bauer*, 2002 MT 7, ¶ 15, 308 Mont. 99, ¶ 15, 39 P.3d 689, ¶ 15. Here, we conclude that the victim's testimony does not contain any such infirmity.

¶21 "[T]his Court has consistently held that a conviction of sexual intercourse without consent is sustainable based entirely on the uncorroborated testimony of the victim." *State*

*v. Whitcher* (1991), 248 Mont. 183, 188, 810 P.2d 751, 754. Thus, Shields' conviction is not rendered infirm by the fact that the State presented no evidence corroborating the victim's testimony that she was asleep during the sexual intercourse.

¶22    Pursuant to the aforementioned precedents, we must reject Shields' argument that the State presented insufficient evidence that the victim was asleep. Viewing the evidence in the light most favorable to the prosecution, and according proper deference to the jury's resolution of conflicting evidence, we conclude that any rationale trier of fact could have found that the victim was indeed sleeping during the sexual intercourse, and therefore "physically helpless," thus establishing that she was incapable of consent.

¶23    Shields also argues that the facts of this case are similar the facts in *Stevens*, upon which this Court reversed two of the defendant's convictions for sexual intercourse without consent because of insufficient evidence that the victims were "physically helpless." The defendant in that case, Stevens, was a massage therapist who operated a massage business in Missoula. *Stevens*, ¶¶ 6, 63. At trial, one victim testified that she fell asleep during a massage while laying on her stomach. *Stevens*, ¶ 11. She further testified that she awoke when Stevens asked her to turn over, and subsequently fell asleep again. *Stevens*, ¶ 11. Finally, she testified that she awoke again and became aware that Stevens was having sexual intercourse with her, at which point she pushed him away. *Stevens*, ¶ 11. Stevens argued on appeal that because she awoke when he asked her to turn over onto her back, "she was not in a very deep sleep." *Stevens*, ¶ 44. We upheld Stevens' conviction with regard to this victim, stating that "[e]ven if [she] had some sensory perception during Stevens' acts,

9

viewing the evidence in a light most favorable to the prosecution, we hold that any rational trier of fact could have found that [she] was asleep, and thereby 'physically helpless,' when Stevens, admittedly, had sexual intercourse with her." *Stevens*, ¶ 45.

¶24 A second victim testified that Stevens engaged in sexual intercourse with her during the course of a massage, and that she was awake and aware of what was happening. *Stevens*, ¶¶ 12, 13. She also testified that she was initially in a "total relaxed state," and that when Stevens began to touch her inappropriately "her mind and body were frozen and she was scared to do anything to stop him." *Stevens*, ¶¶ 12, 13. Finally, she testified that the sexual intercourse and some prior sexual touching by Stevens lasted for approximately ten minutes, after which time she vocally indicated that Stevens should stop, and he did so. *Stevens*, ¶ 13.

¶25 A third victim testified that Stevens engaged in sexual intercourse with her during the course of a massage, and that she was aware of what was happening. *Stevens*, ¶ 16. She also testified that she was in a "deeply relaxed 'dream state' or 'sleep rem stage'" prior to the sexual intercourse. *Stevens*, ¶ 15. Further, she testified that she "did not respond to Stevens' actions initially in order to avoid confrontation with him and a possible further attack." *Stevens*, ¶ 17. Finally, she testified that after a few moments of the sexual intercourse, she vocally indicated that Stevens should stop, and he did so. *Stevens*, ¶ 17.

¶26 We reversed Stevens' convictions for sexual intercourse without consent as to these latter two victims, stating:

> Here, considering the evidence in a light most favorable to the prosecution, we conclude that no rational trier of fact could have found that [these two victims] were "physically helpless" under §§ 45-5-501(1)(b)(ii) and

45-2-101, MCA. While [they] were in a relaxed or dream state during their massages, there is simply no credible evidence in the record demonstrating that they were unconscious or otherwise physically unable to communicate unwillingness to act.

    . . . .

In sum, the State offered no evidence at Stevens' trial that [these two victims] were incapable of consent due to "force" or being "physically helpless." Accordingly, without such evidence, a rational trier of fact could not have found that the State proved the essential element "without consent" beyond a reasonable doubt. We therefore reverse that portion of the District Court's judgment determining that Stevens was guilty of the offense of sexual intercourse without consent with respect to [these two victims].

*Stevens*, ¶¶ 50, 53. However, we then held that the State had proven beyond a reasonable doubt that Stevens committed the offense of sexual assault against these two victims. *Stevens*, ¶ 57. Consequently, we reduced these two convictions of sexual intercourse without consent to the offenses of sexual assault. *Stevens*, ¶ 57.

¶27 Shields argues that the scenario at issue in this case resembles that of the latter two victims in *Stevens*. In support of this argument, Shields cites evidence that the victim in this case had some sensory perception during the incident. Specifically, Shields notes that the victim testified she was aware that her pants were being removed at one point, and that she was aware that she was laying on her stomach at another point. Shields also notes that the victim told Deputy Hanson she was aware that Shields was "playing with her hair" at one point. Despite the victim's awareness of these circumstances, Shields argues, there was no evidence that she indicated he should stop the sexual intercourse.

¶28    We do not find these arguments persuasive. In *Stevens*, the latter two victims testified that they were aware of what was happening when the sexual intercourse began, and that they were aware of the duration of the intercourse. Here, however, the victim testified that she became aware of someone having sexual intercourse with her only when she awoke. This is precisely the state of awareness conveyed by the first victim, noted above, in *Stevens*. We upheld Stevens' conviction as to that victim, and we uphold Shields' conviction here.

¶29    As we held in *Stevens*, a sleeping victim cannot consent to sexual intercourse. *Stevens*, ¶ 43. Here, we have concluded that any rationale trier of fact could have found that the victim in this case was indeed sleeping during the sexual intercourse. As we further indicated in *Stevens*, the fact that a victim has some sensory perception during an incident involving sexual intercourse, does not preclude a jury from finding that the victim was asleep, and therefore "physically helpless," during the sexual intercourse. *Stevens*, ¶ 45.

¶30    Finally, we note that a jury is at liberty to believe all, a part of, or none of the testimony of a witness. *State v. Taylor* (1973), 163 Mont. 106, 116, 515 P.2d 695, 701. Hence, the jury in this trial could have believed that the intercourse lasted ten to fifteen minutes, as Shields testified, and also believed the victim's testimony that she was not aware of what was happening until she awoke. As such, viewing the evidence of the victim's state of awareness in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the victim incapable of consent.

## CONCLUSION

12

¶31 In conclusion, we note that Shields raises several other arguments. He argues that: (1) the State presented insufficient evidence that the victim was incapable of consent by virtue of being overcome by deception, coercion or surprise; (2) the State offered no evidence demonstrating that the victim was compelled to submit by "force," as that term is defined in § 45-5-501(2), MCA; and (3) despite evidence that the victim was intoxicated, the jury could not find that her state of intoxication precluded her from consenting because the District Court did not provide an instruction stating so. We need not address these arguments because we conclude, based on the evidence presented at trial, that any rationale trier of fact could have found, beyond a reasonable doubt, that the victim was incapable of consent by virtue of being asleep, and therefore "physically helpless." As such, we conclude that the State's evidence was not insufficient to support the verdict.

¶32 Accordingly, Shields' conviction is affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM RICE
/S/ BRIAN MORRIS